*850 Justice Souter
delivered the opinion of the Court.
Executives of two counties posted a version of the Ten Commandments on the walls of their courthouses. After suits were filed charging violations of the Establishment Clause, the legislative body of each county adopted a resolution calling for a more extensive exhibit meant to show that the Commandments are Kentucky’s “precedent legal code,” Def. Exh. 1 in Memorandum in Support of Defendants’ Motion to Dismiss in Civ. Action No. 99-507, p. 1 (ED Ky.) (hereinafter Def. Exh.. 1). The result in each instance was a modified display of the Commandments surrounded by texts containing religious references as their sole common element. After changing counsel, the counties revised the exhibits again by eliminating some documents, expanding the text set out in another, and adding some new ones.
The issues are whether a determination of the counties’ purpose is a sound basis for ruling on the Establishment Clause complaints, and whether evaluation of the counties’ claim of secular purpose for the ultimate displays may take their evolution into account. We hold that the counties’ manifest objective may be dispositive of the constitutional *851 enquiry, and that the development of the presentation should be considered when determining its purpose.
I
In the summer of 1999, petitioners McCreary County and Pulaski County, Kentucky (hereinafter Counties), put up in their respective courthouses large, gold-framed copies of an abridged text of the King James version of the Ten Commandments, including a citation to the Book of Exodus.[1] In McCreary County, the placement of the Commandments responded to an order of the county legislative body requiring “the display [to] be posted in ‘a very high traffic area’ of the courthouse.” 96 F. Supp. 2d 679, 684 (ED Ky. 2000). In Pulaski County, amidst reported controversy over the propriety of the display, the Commandments were hung in a ceremony presided over by the county Judge-Executive, who called them “good rules to live by” and who recounted the story of an astronaut who became convinced “there must be a divine God” after viewing the Earth from the moon. Dodson, Commonwealth Journal, July 25, 1999, p. Al, col. 2, in Memorandum in Support of Plaintiffs’ Motion for Preliminary Injunction in Civ. Action No. 99-509 (ED Ky.) (internal quotation marks omitted). The Judge-Executive was accompanied by the pastor of his church, who called the Commandments “a creed of ethics” and told the press after the ceremony that displaying the Commandments was “one of the greatest things the judge could have done to close out the millennium.” Id., at A2, col. 3 (internal quotation marks omitted). In both Counties, this was the version of the Commandments posted:
“Thou shalt have no other gods before me.
*852 “Thou shalt not make unto thee any graven images.
“Thou shalt not take the name of the Lord thy God in vain.
“Remember the sabbath day, to keep it holy.
“Honor thy father and thy mother.
“Thou shalt not kill.
“Thou shalt not commit adultery.
“Thou shalt not steal.
“Thou shalt not bear false witness.
“Thou shalt not covet.
“Exodus 20:3-17.”[2] Def. Exh. 9 in Memorandum in Support of Defendants’ Motion to Dismiss in Civ. Action No. 99-507 (ED Ky.) (hereinafter Def. Exh. 9).
In each County, the hallway display was “readily visible to . . . county citizens who use the courthouse to conduct their civic business, to obtain or renew driver’s licenses and permits, to register ears, to pay local taxes, and to register to vote.” 96 F. Supp. 2d, at 684; American Civil Liberties Union of Kentucky v. Pulaski County, 96 F. Supp. 2d 691, 695 (ED Ky. 2000).
In November 1999, respondents American Civil Liberties Union of Kentucky et al. sued the Counties in Federal District Court under Rev. Stat. § 1979, 42 U. S. C. § 1983, and sought a preliminary injunction against maintaining the displays, which the ACLU charged were violations of the prohibition of religious establishment included in the First Amendment of the Constitution.[3] Within a month, and be *853 fore the District Court had responded to the request for injunction, the legislative body of each County authorized a second, expanded display, by nearly identical resolutions reciting that the Ten Commandments are “the precedent legal code upon which the civil and criminal codes of... Kentucky are founded,” and stating several grounds for taking that position: that “the Ten Commandments are codified in Kentucky’s civil and criminal laws”; that the Kentucky House of Representatives had in 1993 “voted unanimously ... to adjourn ... ‘in remembrance and honor of Jesus Christ, the Prince of Ethics’ that the “County Judge and . . . magistrates agree with the arguments set out by Judge [Roy] Moore” in defense of his “display [of] the Ten Commandments in his courtroom”; and that the “Founding Father[s] [had an] explicit understanding of the duty of elected officials to publicly acknowledge God as the source of America’s strength and direction.” Def. Exh. 1, at 1-3, 6.
As directed by the resolutions, the Counties expanded the displays of the Ten Commandments in their locations, presumably along with copies of the resolution, which instructed that it, too, be posted, id., at 9. In addition to the first display’s large framed copy of the edited King James version of the Commandments,[4] the second included eight other documents in smaller frames, each either having a religious *854 theme or excerpted to highlight a religious element. The documents were the “endowed by their Creator” passage from the Declaration of Independence; the Preamble to the Constitution of Kentucky; the national motto, “In God We Trust”; a page from the Congressional Record of February 2, 1983, proclaiming the Year of the Bible and including a statement of the Ten Commandments; a proclamation by President Abraham Lincoln designating April 30,1863, a National Day of Prayer and Humiliation; an excerpt from President Lincoln’s “Reply to Loyal Colored People of Baltimore upon Presentation of a Bible,” reading that “[t]he Bible is the best gift God has ever given to man”; a proclamation by President Reagan marking 1983 the Year of the Bible; and the Mayflower Compact. 96 F. Supp. 2d, at 684; 96 F. Supp. 2d, at 695-696.
After argument, the District Court entered a preliminary injunction on May 5, 2000, ordering that the “display ... be removed from [each] County Courthouse IMMEDIATELY” and that no county official “erect or cause to be erected similar displays.” 96 F. Supp. 2d, at 691; 96 F. Supp. 2d, at 702-703. The court’s analysis of the situation followed the three-part formulation first stated in Lemon v. Kurtzman, 403 U. S. 602 (1971). As to governmental purpose, it concluded that the original display “lack[edj any secular purpose” because the Commandments “are a distinctly religious document, believed by many Christians and Jews to be the direct and revealed word of God.” 96 F. Supp. 2d, at 686; 96 F. Supp. 2d, at 698. Although the Counties had maintained that the original display was meant to be educational, “[t]he narrow scope of the display — a single religious text unaccompanied by any interpretation explaining its role as a foundational document — can hardly be said to present meaningfully the story of this country’s religious traditions.” 96 F. Supp. 2d, at 686-687; 96 F. Supp. 2d, at 698. The court found that the second version also» “clearly lack[ed] a secular purpose” because the “Count[ies] narrowly tailored [their] selection of *855 foundational documents to incorporate only those with specific references to Christianity.”[5] 96 F. Supp. 2d, at 687; 96 F. Supp. 2d, at 699.
The Counties filed a notice of appeal from the preliminary injunction but voluntarily dismissed it after hiring new lawyers. They then installed another display in each courthouse, the third within a year. No new resolution authorized this one, nor did the Counties repeal the resolutions that preceded the second. The posting consists of nine framed documents of equal size, one of them setting out the Ten Commandments explicitly identified as the “King James Version” at Exodus 20:3-17, 145 F. Supp. 2d 845, 847 (ED Ky. 2001), and quoted at greater length than before:
“Thou shalt have no other gods before me.
“Thou shalt not make unto thee any graven image, or any likeness of any thing that is in heaven above, or that is in the earth beneath, or that is in the water underneath the earth: Thou shalt not bow down thyself to them, nor serve them: for I the LORD thy God am a jealous God, visiting the iniquity of the fathers upon the children unto the third and fourth generation of them that hate me.
“Thou shalt not take the name of the LORD thy God in vain: for the LORD will not hold him guiltless that taketh his name in vain.
“Remember the sabbath day, to keep it holy.
“Honour thy father and thy mother: that thy days may be long upon the land which the LORD thy God giveth thee.
“Thou shalt not kill.
*856 “Thou shalt not commit adultery.
“Thou shalt not steal.
“Thou shalt not bear false witness against thy neighbour.
“Thou shalt not covet thy neighbour’s house, thou shalt not covet th[y] neighbor’s wife, nor his manservant, nor his maidservant, nor his ox, nor his ass, nor anything that is th[y] neighbour’s.” App. to Pet. for Cert. 189a.
Assembled with the Commandments are framed copies of the Magna Carta, the Declaration of Independence, the Bill of Rights, the lyrics of the Star Spangled Banner, the Mayflower Compact, the National Motto, the Preamble to the Kentucky Constitution, and a picture of Lady Justice. The collection is entitled “The Foundations of American Law and Government Display” and each document comes with a statement about its historical and legal significance. The comment on the Ten Commandments reads:
“The Ten Commandments have profoundly influenced the formation of Western legal thought and the formation of our country. That influence is clearly seen in the Declaration of Independence, which declared that ‘We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness.’ The Ten Commandments provide the moral background of the Declaration of Independence and the foundation of our legal tradition.” Id., at 180a.
The ACLU moved to supplement the preliminary injunction to enjoin the Counties’ third display,[6] and the Counties responded with several explanations for the new version, in- *857 eluding desires “to demonstrate that the Ten Commandments were part of the foundation of American Law and Government” and “to educate the citizens of the county regarding some of the documents that played a significant role in the foundation of our system of law and government.” 145 F. Supp. 2d, at 848 (internal quotation marks omitted). The court, however, took the objective of proclaiming the Commandments' foundational value as “a religious, rather than secular, purpose” under Stone v. Graham, 449 U. S. 39 (1980) (per curiam), 145 F. Supp. 2d, at 849, and found that the assertion that the Counties’ broader educational goals are secular “crumble[s] .. . upon an examination of the history of this litigation,” ibid. In light of the Counties’ decision to post the Commandments by themselves in the first instance, contrary to Stone, and later to “accentuate]” the religious objective by surrounding the Commandments with “specific references to Christianity,” the District Court understood the Counties’ “clear” purpose as being to post the Commandments, not to educate.[7] 145 F. Supp. 2d, at 849-850 (internal quotation marks omitted).
As requested, the trial court supplemented the injunction, and a divided panel of the Court of Appeals for the Sixth Circuit affirmed. The Circuit majority stressed that under Stone, displaying the Commandments bespeaks a religious object unless they are integrated with other material so as to carry “a secular message,” 354 F. 3d 438, 449 (2003). The majority judges saw no integration here because of a “lack of a demonstrated analytical or historical connection [be *858 tween tfle Commandments and] the other documents.” Id., at 451. They noted in particular that the Counties offered no support for their claim that the Ten Commandments “provided] the moral backdrop” to the Declaration of Independence or otherwise “profoundly influenced” it. Ibid, (internal quotation marks omitted). The majority found that the Counties’ purpose was religious, not educational, given the nature of the Commandments as “an active symbol of religion [stating] ‘the religious duties of believers.’ ” Id., at 455. The judges in the majority understood the identical displays to emphasize “a single religious influence, with no mention of any other religious or secular influences,” id., at 454, and they took the very history of the litigation as evidence of the Counties’ religious objective, id., at 457.
Judge Ryan dissented on the basis of wide recognition that religion, and the Ten Commandments in particular, have played a foundational part in the evolution of American law and government; he saw no reason to gainsay the Counties’ claim of secular purposes. Id., at 472-473. The dissent denied that the prior displays should have any bearing on the constitutionality of the current one: a “history of unconstitutional displays can[not] be used as a sword to strike down an otherwise constitutional display.”[8] Id., at 478.
We granted certiorari, 543 U. S. 924 (2004), and now affirm.
*859 II
Twenty-five years ago in a case prompted by posting the Ten Commandments in Kentucky’s public schools, this Court recognized that the Commandments “are undeniably a sacred text in the Jewish and Christian faiths” and held that their display in public classrooms violated the First Amendment’s bar against establishment of religion. Stone, 449 U. S., at 41. Stone found a predominantly religious purpose in the government’s posting of the Commandments, given their prominence as “ ‘an instrument of religion,’ ” id., at 41, n. 3. (quoting School Dist. of Abington Township v. Schempp, 374 U. S. 203, 224 (1963)). The Counties ask for a different approach here by arguing that official purpose is unknowable and the search for it inherently vain. In the alternative, the Counties would avoid the District Court’s conclusion by having us limit the scope of the purpose enquiry so severely that any trivial rationalization would suffice, under a standard oblivious to the history of religious government action like the progression of exhibits in this case.
A
Ever since Lemon v. Kurtzman summarized the three familiar considerations for evaluating Establishment Clause claims, looking to whether government action has “a secular legislative purpose” has been a common, albeit seldom dis-positive, element of our cases. 403 U. S., at 612. Though we have found government action motivated by an illegitimate purpose only four times since Lemon,[9] and “the secular purpose requirement alone may rarely be determinative ..., it nevertheless serves an important fimetion.”[10] Wallace v. *860 Jaffree, 472 U. S. 38, 75 (1985) (O’Connor, J., concurring in judgment).
The touchstone for our analysis is the principle that the “First Amendment mandates governmental neutrality between religion and religion, and between religion and nonre-ligion.” Epperson v. Arkansas, 393 U. S. 97, 104 (1968); Everson v. Board of Ed. of Ewing, 330 U. S. 1, 15-16 (1947); Wallace, supra, at 53. When the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government’s ostensible object is to take sides. Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U. S. 327, 335 (1987) (“Lemon’s ‘purpose’ requirement aims at preventing [government] from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters”). Manifesting a purpose to favor one faith over another,, or adherence to religion generally, clashes with the “understanding, reached ... after decades of religious war, that liberty and social stability demand a religious tolerance that respects the religious views of all citizens ....” Zelman v. Simmons-Harris, 536 U. S. 639, 718 (2002) (Breyer, J., dissenting). By showing a purpose to favor religion, the government “sends the . . . message to . . . nonadherents ‘that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members-’” Santa Fe Independent School Dist. v. Doe, 530 U. S. 290, 309-310 (2000) (quoting Lynch v. Donnelly, 465 U. S. 668, 688 (1984) (O’Connor, J., concurring)).
Indeed, the purpose apparent from government action can have an impact more significant than the result expressly *861 decreed: when the government maintains Sunday closing laws, it advances religion only minimally because many working people would take the day as one of rest regardless, but if the government justified its decision with a stated desire for all Americans to honor Christ, the divisive thrust of the official action would be inescapable. This is the teaching of McGowan v. Maryland, 366 U. S. 420 (1961), which upheld Sunday closing statutes on practical, secular grounds after finding that the government had forsaken the religious purposes behind centuries-old predecessor laws. Id., at 449-451
B
Despite the intuitive importance of official purpose to the realization of Establishment Clause values, the Counties ask us to abandon Lemon's purpose test, or at least to truncate any enquiry into purpose here. Their first argument is that the very consideration of purpose is deceptive: according to them, true “purpose” is unknowable, and its search merely an excuse for courts to act selectively and unpredietably in picking out evidence of subjective intent. The assertions are as seismic as they are unconvincing.
Examination of purpose is a staple of statutory interpretation that makes up the daily fare of every appellate court in the country, e. g., General Dynamics Land Systems, Inc. v. Cline, 540 U. S. 581, 600 (2004) (interpreting statute in light of its “text, structure, purpose, and history”), and governmental purpose is a key element of a good deal of constitutional doctrine, e. g., Washington v. Davis, 426 U. S. 229 (1976) (discriminatory purpose required for Equal Protection violation); Hunt v. Washington State Apple Advertising Comm’n, 432 U. S. 333, 352-353 (1977) (discriminatory purpose relevant to dormant Commerce Clause claim); Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U. S. 520 (1993) (discriminatory purpose raises level of scrutiny required by free exercise claim). With enquiries into purpose this common, if they were nothing but hunts for mares’ nests deflect *862 ing attention from bare judicial will, the whole notion of purpose in law would have dropped into disrepute long ago.
But scrutinizing purpose does make practical sense, as in Establishment Clause analysis, where an understanding of official objective emerges from readily discoverable fact, without any judicial psychoanalysis of a drafter’s heart of hearts. Wallace, 472 U. S., at 74 (O’Connor, J., concurring in judgment). The eyes that look to purpose belong to an “ ‘objective observer,’ ” one who takes account of the traditional external signs that show up in the “ ‘text, legislative history, and implementation of the statute,’” or comparable official act. Santa Fe, supra, at 308 (quoting Wallace, supra, at 76 (O’Connor, J., concurring in judgment)); see also Edwards v. Aguillard, 482 U. S. 578, 594-595 (1987) (enquiry looks to “plain meaning of the statute’s words, enlightened by their context and the contemporaneous legislative history [and] the historical context of the statute, . . . and the specific sequence of events leading to [its] passage”). There is, then, nothing hinting at an unpredictable or disingenuous exercise when a court enquires into purpose after a claim is raised under the Establishment Clause.
The cases with findings of a predominantly religious purpose point to the straightforward nature of the test. In Wallace, for example, we inferred purpose from a change of wording from an earlier statute to a later one, each dealing with prayer in schools. 472 U. S., at 58-60. And in Edwards, we relied on a statute’s text and the detailed public comments of its sponsor, when we sought the purpose of a state law requiring creationism to be taught alongside evolution. 482 U. S., at 586-588. In other cases, the government action itself bespoke the purpose, as in Abington, where the object of required Bible study in public schools was patently religious, 374 U. S., at 223-224; in Stone, the Court held that the “[p]osting of religious texts on the wall serve[d] no . . . educational function,” and found that if “the posted copies of the Ten Commandments [were] to have any effect at all, it *863 [would] be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments.” 449 U. S., at 42. In each case, the government’s action was held unconstitutional only because openly available data supported a commonsense conclusion that a religious objective permeated the government’s action.
Nor is there any indication that the enquiry is rigged in practice to finding a religious purpose dominant every time a case is filed. In the past, the test has not been fatal very often, presumably because government does not generally act unconstitutionally, with the predominant purpose of advancing religion. That said, one consequence of the corollary that Establishment Clause analysis does not look to the veiled psyche of government officers could be that in some of the cases in which establishment complaints failed, savvy officials had disguised their religious intent so cleverly that the objective observer just missed it. But that is no reason for great constitutional concern. If someone in the government hides religious motive so well that the “ ‘objective observer, acquainted with the text, legislative history, and implementation of the statute,’ ” Santa Fe, 530 U. S., at 308 (quoting Wallace, supra, at 76 (O’Connor, J., concurring in judgment)), cannot see it, then without something more the government does not make a divisive announcement that in itself amounts to taking religious sides. A secret motive stirs up no strife and does nothing to make outsiders of non-adherents, and it suffices to wait and see whether such government action turns out to have (as it may even be likely to have) the illegitimate effect of advancing religion.
C
After declining the invitation to abandon concern with purpose wholesale, we also have to avoid the Counties’ alternative tack of trivializing the enquiry into it. The Counties would read the cases as if the purpose enquiry were so naive that any transparent claim to secularly would satisfy it, and *864 they would cut context out of the enquiry, to the point of ignoring history, no matter what bearing it actually had on the significance of current circumstances. There is no precedent for the Counties’ arguments, or reason supporting them.
1
Lemon said that government action must have “a secular . . . purpose,” 403 U. S., at 612, and after a host of cases it is fair to add that although a legislature’s stated reasons will generally get deference, the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective. See, e. g., Santa Fe, supra, at 308 (“When a governmental entity professes a secular purpose for an arguably religious policy, the government’s characterization is, of course, entitled to some deference. But it is nonetheless the duty of the courts to 'distinguís [h] a sham secular purpose from a sincere one’”); Edwards, 482 U. S., at 586-587 (“While the Court is normally deferential to a State’s articulation of a secular purpose, it is required that the statement of such purpose be sincere and not a sham”); id., at 590, 594 (referring to enquiry as one into “preeminent” or “primary” purpose); Stone, supra, at 41 (looking to the “pre-eminent purpose” of government action).
Even the Countie'sown authority confirms that we have not made the purpose test a pushover for any secular claim. True, Wallace said government action is tainted by its object “if it is entirely motivated by a purpose to advance religion,” 472 U. S., at 56, a remark that suggests, in isolation, a fairly complaisant attitude. But in that very case the Court declined to credit Alabama’s stated secular rationale of “accommodation” for legislation authorizing a period of silence in school for meditation or voluntary prayer, given the implausibility of that explanation in light of another statute already accommodating children wishing to pray. Id., at 57, n. 45 (internal quotation marks omitted). And it would *865 be just as much a mistake to infer that a timid standard underlies the statement in Lynch v. Donnelly that the purpose enquiry looks to whether government “activity was motivated wholly by religious considerations,” 465 U. S., at 680; for two cases cited for that proposition had examined and rejected claims of secular purposes that turned out to be implausible or inadequate:[11] Stone, supra, at 41; Abington, 374 U. S., at 223-224.[12] See also Bowen v. Kendrick, 487 U. S. 589, 602 (1988) (using the “motivated wholly by an impermissible purpose” language, but citing Lynch and Stone). As we said, the Court often does accept governmental statements of purpose, in keeping with the respect owed in the first instance to such official claims. But in those unusual cases where the claim was an apparent sham, or the secular purpose secondary, the unsurprising results have been findings of no adequate secular object, as against a predominantly religious one.[13]
*866 2
The Counties’ second proffered limitation can be dispatched quickly. They argue that purpose in a case like this one should be inferred, if at all, only from the latest news about the last in a series of governmental actions, however close they may all be in time and subject. But the world is not made brand new every morning, and the Counties are simply asking us to ignore perfectly probative evidence; they want an absentminded objective observer, not one presumed to be familiar with the history of the government’s actions and competent to learn what history has to show, Santa Fe, 530 U. S., at 308 (objective observer is familiar with ‘“implementation of’ ” government action (quoting Wallace, supra, at 76 (O’Connor, J., concurring in judgment))); Edwards, supra, at 595 (enquiry looks to “the historical context of the statute . . . and the specific sequence of events leading to [its] passage”); Capitol Square Review and Advisory Bd. v. Pinette, 515 U. S. 753, 780 (1995) (O’Connor, J., concurring in part and concurring in judgment) (“[T]he reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the religious display appears”). The Counties’ position just bucks common sense: reasonable observers have reasonable memories, and our precedents sensibly forbid an observer “to turn a blind eye to the context in which [the] policy arose.”[14] Santa Fe, supra, at 315.
*867 hH
This case comes to us on appeal from a preliminary injunction. We accordingly review the District Court’s legal rulings de novo, and its ultimate conclusion for abuse of discretion.[15] Ashcroft v. American Civil Liberties Union, 542 U. S. 656 (2004).
We take Stone as the initial legal benchmark, our only case dealing with the constitutionality of displaying the Commandments. Stone recognized that the Commandments are an “instrument of religion” and that, at least on the facts before it, the display of their text could presumptively be understood as meant to advance religion: although state law specifically required their posting in public school classrooms, their isolated exhibition did not leave room even for an argument that secular education explained their being there. 449 U. S., at 41, n. 3 (internal quotation marks omitted). But Stone did not purport to decide the constitutionality of every possible way the Commandments might be set out by the government, and under the Establishment Clause detail is key. County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter, 492 U. S. 573, 595 *868 (1989) (opinion of Blackmun, J.) (“[T]he question is what viewers may fairly understand to be the purpose of the display. That inquiry, of necessity, turns upon the context in which the contested object appears” (internal quotation marks and citation omitted)). Hence, we look to the record of evidence showing the progression leading up to the third display of the Commandments.
A
The display rejected in Stone had two obvious similarities to the first one in the sequence here: both set out a text of the Commandments as distinct from any traditionally symbolic representation, and each stood alone, not part of an arguably secular display. Stone stressed the significance of integrating the Commandments into a secular scheme to forestall the broadcast of an otherwise clearly religious message, 449 U. S., at 42, and for good reason, the Commandments being a central point of reference in the religious and moral history of Jews and Christians. They proclaim the existence of a monotheistic god (no other gods). They regulate details of religious obligation (no graven images, no sabbath breaking, no vain oath swearing). And they unmistakably rest even the universally accepted prohibitions (as against murder, theft, and the like) on the sanction of the divinity proclaimed at the beginning of the text. Displaying that text is thus different from a symbolic depiction, like tablets with 10 roman numerals, which could be seen as alluding to a general notion of law, not a sectarian conception of faith. Where the text is set out, the insistence of the religious message is hard to avoid in the absence of a context plausibly suggesting a message going beyond an excuse to promote the religious point of view. The display in Stone had no context that might have indicated an object beyond the religious character of the text, and the Counties’ solo exhibit here did nothing more to counter the sectarian implication than the *869 postings at issue in Stone.[16] See also County of Allegheny, supra, at 598 (“Here, unlike in Lynch [v. Donnelly], nothing in the context of the display detracts from the creche’s religious message”). Actually, the posting by the Counties lacked even the Stone display’s implausible disclaimer that the Commandments were set out to show their effect on the civil law.[17] What is more, at the ceremony for posting the framed Commandments in Pulaski County, the county executive was accompanied by his pastor, who testified to the certainty of the existence of God. The reasonable observer could only think that the Counties meant to emphasize and celebrate the Commandments’ religious message.
This is not to deny that the Commandments have had influence on civil or secular law; a major text of a majority religion is bound to be felt. The point is simply that the original text viewed in its entirety is an unmistakably religious statement dealing with religious obligations and with morality subject to religious sanction. When the government initiates an effort to place this statement alone in public view, a religious object is unmistakable.
B
Once the Counties were sued, they modified the exhibits and invited additional insight into their purpose in a display that hung for about six months. This new one was the product of forthright and nearly identical Pulaski and McCreary County resolutions listing a series of American historical documents with theistic and Christian references, which *870 were to be posted in order to furnish a setting for displaying the Ten Commandments and any “other Kentucky and American historical documen[t]” without raising concern about “any Christian or religious references” in them. Def. Exh. 1, at 1. As mentioned, the resolutions expressed support for an Alabama judge who posted the Commandments in his courtroom, and cited the fact the Kentucky Legislature once adjourned a session in honor of “Jesus Christ, the Prince of Ethics.” Id., at 2-3.
In this second display, unlike the first, the Commandments were not hung in isolation, merely leaving the Counties’ purpose to emerge from the pervasively religious text of the Commandments themselves. Instead, the second version was required to include the statement of the government’s purpose expressly set out in the county resolutions, and underscored it by juxtaposing the Commandments to other documents with highlighted references to God as their sole common element. The display’s unstinting focus was on religious passages, showing that the Counties were posting the Commandments precisely because of their sectarian content. That demonstration of the government’s objective was enhanced by serial religious references and the accom-. panying resolution’s claim about the embodiment of ethics in Christ. Together, the display and resolution presented an indisputable, and undisputed, showing of an impermissible purpose.
Today, the Counties make no attempt to defend their undeniable objective, but instead hopefully describe version two as “dead and buried.” Reply Brief for Petitioners 15. Their refusal to defend the second display is understandable, but the reasonable observer could not forget it.
C
1
After the Counties changed lawyers, they mounted a third display, without a new resolution or repeal of the old one. The result was the “Foundations of American Law and Gov- *871 eminent” exhibit, which placed the Commandments in the company of other documents the Counties thought especially significant in the historical foundation of American government. In trying to persuade the District Court to lift the preliminary injunction, the Counties cited several new purposes for the third version, including a desire “to educate the citizens of the county regarding some of the documents that played a significant role in the foundation of our system of law and government.”[18] 145 F. Supp. 2d, at 848 (internal quotation marks omitted). The Counties’ claims did not, however, persuade the court, intimately familiar with the details of this litigation, or the Court of Appeals, neither of which found a legitimizing secular purpose in this third version of the display. “ ‘When both courts [that have already passed on the ease] are unable to discern an arguably valid secular purpose, this Court normally should hesitate to find one.’” Edwards, 482 U. S., at 594, n. 15 (quoting Wallace, 472 U. S., at 66 (Powell, J., concurring)). The conclusions of the two courts preceding us in this case are well warranted.
These new statements of purpose were presented only as a litigating position, there being no further authorizing action by the Counties’ governing boards. And although repeal of the earlier county authorizations would not have erased them from the record of evidence bearing on current purpose,[19] the extraordinary resolutions for the second display passed just months earlier were not repealed or other *872 wise repudiated.[20] Indeed, the sectarian spirit of the common resolution found enhanced expression in the third display, which quoted more of the purely religious language of the Commandments than the first two displays had done; for additions, see App. to Pet. for Cert. 189a (“I the LORD thy God am a jealous God”) (text of Second Commandment in third display); (“the LORD will not hold him guiltless that taketh his name in vain”) (text of Third Commandment); and (“that thy days may be long upon the land which the LORD thy God giveth thee”) (text of Fifth Commandment). No reasonable observer could swallow the claim that the Counties had cast off the objective so unmistakable in the earlier displays.
Nor did the selection of posted material suggest a clear theme that might prevail over evidence of the continuing religious object. In a collection of documents said to be “foundational” to American government, it is at least odd to include a patriotic anthem, but to omit the Fourteenth Amendment, the most significant structural provision adopted since the original Framing. And it is no less baffling to leave out the original Constitution of 1787 while quoting the 1215 Magna Carta even to the point of its declaration that “fish-weirs shall be removed from the Thames.” Id., at 205a, ¶33. If an observer found these choices and omissions perplexing in isolation, he would be puzzled for a *873 different reason when he read the Declaration of Independence seeking confirmation for the Counties’ posted explanation that the Ten Commandments’ “influence is clearly seen in the Declaration,” id., at 180a; in fact the observer would find that the Commandments are sanctioned as divine imperatives, while the Declaration of Independence holds that the authority of government to enforce the law derives “from the consent of the governed,” id., at 190a.[21] If the observer had not thrown up his hands, he would probably suspect that the Counties were simply reaching for any way to keep a religious document on the walls of courthouses constitutionally required to embody religious neutrality.[22]
2
In holding the preliminary injunction adequately supported by evidence that the Counties’ purpose had not changed at the third stage, we do not decide that the Coun *874 ties’ past actions forever taint any effort on their part to deal with the subject matter. We hold only that purpose needs to be taken seriously under the Establishment Clause and needs to be understood in light of context; an implausible claim that governmental purpose has changed should not carry the day in a court of law any more than in a head with common sense. It is enough to say here that district courts are fully capable of adjusting preliminary relief to take account of genuine changes in constitutionally significant conditions. See Ashcroft v. American Civil Liberties Union, 542 U. S. 656 (2004).
Nor do we have occasion here to hold that a sacred text can never be integrated constitutionally into a governmental display on the subject of law, or American history. We do not forget, and in this litigation have frequently been reminded, that our own courtroom frieze was deliberately designed in the exercise of governmental authority so as to include the figure of Moses holding tablets exhibiting a portion of the Hebrew text of the later, secularly phrased Commandments; in the company of 17 other lawgivers, most of them secular figures, there is no risk that Moses would strike an observer as evidence that the National Government was violating neutrality in religion.[23]
<1
The importance of neutrality as an interpretive guide is no less true now than it was when the Court broached the principle in Everson v. Board of Ed. of Ewing, 330 U. S. 1 (1947), and a word needs to be said about the different view taken in today’s dissent. We all agree, of course, on the need for some interpretative help. The First Amendment contains no textual definition of "establishment,” and the *875 term is certainly not self-defining. No one contends that the prohibition of establishment stops at a designation of a national (or with Fourteenth Amendment incorporation, Cantwell v. Connecticut, 310 U. S. 296, 303 (1940), a state) church, but nothing in the text says just how much more it covers. There is no simple answer, for more than one reason.
The prohibition on establishment covers a variety of issues from prayer in widely varying government settings, to financial aid for religious individuals and institutions, to comment on religious questions. In these varied settings, issues of interpreting inexact Establishment Clause language, like difficult interpretative issues generally, arise from the tension of competing values, each constitutionally respectable, but none open to realization to the logical limit.
The First Amendment has not one but two clauses tied to “religion,” the second forbidding any prohibition on “the free exercise thereof,” and sometimes, the two clauses compete: spending government money on the clergy looks like establishing religion, but if the government cannot pay for military chaplains a good many soldiers and sailors would be kept from the opportunity to exercise their chosen religions. See Cutter v. Wilkinson, 544 U. S. 709, 719 (2005). At other times, limits on governmental action that might make sense as a way to avoid establishment could arguably limit freedom of speech when the speaking is done under government auspices. Rosenberger v. Rector and Visitors of Univ. of Va., 515 U. S. 819 (1995). The dissent, then, is wrong to read cases like Walz v. Tax Comm’n of City of New York, 397 U. S. 664 (1970), as a rejection of neutrality on its own terms, post, at 891-892, for tradeoffs are inevitable, and an elegant interpretative rule to draw the line in all the multifarious situations is not to be had.
Given the variety of interpretative problems, the principle of neutrality has provided a good sense of direction: the government may not favor one religion over another, or religion over irreligión, religious choice being the prerogative of indi *876 viduals under the Free Exercise Clause. The principle has been helpful simply because it responds to one of the major concerns that prompted adoption of the Religion Clauses. The Framers and the citizens of their time intended not only to protect the integrity of individual conscience in religious matters, Wallace, 472 U. S., at 52-54, and n. 38, but to guard against the civic divisiveness that follows when the government weighs in on one side of religious debate; nothing does a better job of roiling society, a point that needed no explanation to the descendants of English Puritans and Cavaliers (or Massachusetts Puritans and Baptists). E.g., Everson, supra, at 8 (“A large proportion of the early settlers of this country came here from Europe to escape [religious persecution]”). A sense of the past thus points to governmental neutrality as an objective of the Establishment Clause, and a sensible standard for applying it. To be sure, given its generality as a principle, an appeal to neutrality alone cannot possibly lay every issue to rest, or tell us what issues on the margins are substantial enough for constitutional significance, a point that has been clear from the founding era to modern times. E. g., Letter from J. Madison to R. Adams (1832), in 5 The Founders’ Constitution 107 (P. Kurland & R. Lerner eds. 1987) (“[In calling for separation] I must admit moreover that it may not be easy, in every possible case, to trace the line of separation between the rights of religion and the Civil authority with such distinctness as to avoid collisions & doubts on unessential points”); Sherbert v. Verner, 374 U. S. 398, 422 (1963) (Harlan, J., dissenting) (“The constitutional obligation of ‘neutrality’... is not so narrow a channel that the slightest deviation from an absolutely straight course leads to condemnation”). But invoking neutrality is a prudent way of keeping sight of something the Framers of the First Amendment thought important.
The dissent, however, puts forward a limitation on the application of the neutrality principle, with citations to historical evidence said to show that the Framers understood the *877 ban on establishment of religion as sufficiently narrow to allow the government to espouse submission to the divine will. The dissent identifies God as the God of monotheism, all of whose three principal strains (Jewish, Christian, and Muslim) acknowledge, the religious importance of the Ten Commandments. Post, at 893-894. On the dissent’s view, it apparently follows that even rigorous espousal of a common element of this common monotheism is consistent with the establishment ban.
But the dissent’s argument for the original understanding is flawed from the outset by its failure to consider the full range of evidence showing what the Framers believed. The dissent is certainly correct in putting forward evidence that some of the Framers thought some endorsement of religion was compatible with the establishment ban; the dissent quotes the first President as stating that “[n]ational morality [cannot] prevail in exclusion of religious principle,” for example, post, at 887 (internal quotation marks omitted), and it cites his first Thanksgiving proclamation giving thanks to God, post, at 886-887. Surely if expressions like these from Washington and his contemporaries were all we had to go on, there would be a good case that the neutrality principle has the effect of broadening the ban on establishment beyond the Framers’ understanding of it (although there would, of course, still be the question of whether the historical case could overcome some 60 years of precedent taking neutrality as its guiding principle).[24]
*878 But the fact is that we do have more to go on, for there is also evidence supporting the proposition that the Framers intended the Establishment Clause to require governmental neutrality in matters of religion, including neutrality in statements acknowledging religion. The very language of the Establishment Clause represented a significant departure from early drafts that merely prohibited a single national religion, and the final language instead “extended [the] prohibition to state support for ‘religion’ in general.” See Lee v. Weisman, 505 U. S. 577, 614-615 (1992) (Souter, J., concurring) (tracing development of language).
The historical record, moreover, is complicated beyond the dissent’s account by the writings and practices of figures no less influential than Thomas Jefferson and James Madison. Jefferson, for example, refused to issue Thanksgiving Proclamations because he believed that they violated the Constitution. See Letter to S. Miller (Jan. 23,1808), in 5 The Founders’ Constitution, supra, at 98. And Madison, whom the dissent claims as supporting its thesis, post, at 888, criticized Virginia’s general assessment tax not just because it required people to donate “three pence” to religion, but because “it is itself a signal of persecution. It degrades from the equal rank of Citizens all those whose opinions in Religion do not bend to those of the Legislative authority.” 505 U. S., at 622 (internal quotation marks omitted); see also Letter from J. Madison to E. Livingston (July 10,1822), in 5 The Founders’ Constitution, supra, at 106 (“[R]eligion & Govt, will both exist in greater purity, the less they are mixed together”); Letter from J. Madison to J. Adams (Sept. 1833), in Religion and Politics in the Early Republic 120 (D. Bresi-bach ed. 1996) (stating that with respect to religion and government the “tendency to a usurpation on one side, or the other, or to a corrupting coalition or alliance between them, will be best guarded against by an entire abstinence of the *879 Government from interference”); Van Orden v. Perry, ante, at 724-725 (Stevens, J., dissenting).[25]
The fair inference is that there was no common understanding about the limits of the establishment prohibition, and the dissent’s conclusion that its narrower view was the original understanding, post, at 886-888, stretches the evidence beyond tensile capacity. What the evidence does show is a group of statesmen, like others before and after them, who proposed a guarantee with contours not wholly worked out, leaving the Establishment Clause with edges still to be determined. And none the worse for that. Indeterminate edges are the kind to have in a constitution meant to endure, and to meet “exigencies which, if foreseen at all, must have been seen dimly, and which can be best provided for as they occur.” McCulloch v. Maryland, 4 Wheat. 316, 415 (1819).
While the dissent fails to show a consistent original understanding from which to argue that the neutrality principle should be rejected, it does manage to deliver a surprise. As mentioned, the dissent says that the deity the Framers had in mind was the God of monotheism, with the consequence that government may espouse a tenet of traditional monotheism. This is truly a remarkable view. Other Members of the Court have dissented on the ground that the Establishment Clause bars nothing more than governmental preference for one religion over another, e. g., Wallace, 472 U. S., at 98-99 (Rehnquist, J., dissenting), but at least religion has previously been treated inclusively. Today’s dissent, how *880 ever, apparently means that government should be free to approve the core beliefs of a favored religion over the tenets of others, a view that should trouble anyone who prizes religious liberty. Certainly history cannot justify it; on the contrary, history shows that the religion of concern to the Framers was not that of the monotheistic faiths generally, but Christianity in particular, a fact that no Member of this Court takes as a premise for construing the Religion Clauses. Justice Story probably reflected the thinking of the framing generation when he wrote in his Commentaries that the purpose of the Clause was “not to countenance, much less to advance, Mahometanism, or Judaism, or infidelity, by prostrating Christianity; but to exclude all rivalry among Christian sects.” R. Cord, Separation of Church and State: Historical Fact and Current Fiction 13 (1988) (emphasis deleted). The Framers would, therefore, almost certainly object to the dissent’s unstated reasoning that because Christianity was a monotheistic “religion,” monotheism with Mosaic antecedents should be a touchstone of establishment interpretation.[26] Even on originalist critiques of existing precedent there is, it seems, no escape from interpretative consequences that would surprise the Framers. Thus, it appears to be common ground in the interpretation of a Constitution “intended to endure for ages to come,” McCulloch v. *881 Maryland, supra, at 415, that applications unanticipated by the Framers are inevitable.
Historical evidence thus supports no solid argument for changing course (whatever force the argument might have when directed at the existing precedent), whereas public discourse at the present time certainly raises no doubt about the value of the interpretative approach invoked for 60 years now. We are centuries away from the St. Bartholomew’s Day massacre and the treatment of heretics in early Massachusetts, but the divisiveness of religion in current public life is inescapable. This is no time to deny the prudence of understanding the Establishment Clause to require the government to stay neutral on religious belief, which is reserved for the conscience of the individual.
V
Given the ample support for the District Court’s finding of a predominantly religious purpose behind the Counties’ third display, we affirm the Sixth Circuit in upholding the preliminary injunction.

It is so ordered.

 We do not consider here a display of the Ten Commandments in schoolrooms in Harlan County, Kentucky, that was litigated in consolidated proceedings in the District Court and Court of Appeals. That display is the subject of a separate petition to this Court.

 This text comes from a record exhibit showing the Pulaski County Commandments that were part of the County’s first and second displays. The District Court found that the displays in each County were functionally identical. 96 F. Supp. 2d 679, 682, n. 2 (ED Ky. 2000); 96 F. Supp. 2d 691, 693, n. 2 (ED Ky. 2000).

 The First Amendment provides that “Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . .” This prohibition of establishment applies to “the States *853 and their political subdivisions” through the Fourteenth Amendment. Santa Fe Independent School Dist. v. Doe, 530 U. S. 290, 301 (2000).

 The District Court noted that there was some confusion as to whether the Ten Commandments hung independently in the second display, or were incorporated into the copy of the page from the Congressional Record declaring 1983 “the Year of the Bible.” 96 F. Supp. 2d, at 684, and n. 4; 96 F. Supp. 2d, at 695-696, and n. 4. The exhibits in the record depict the Commandments hanging as a separate item, Def. Exh. 9, and that is more consistent with the Counties’ description of the second display in this Court. “[After erecting the first display] Petitioners posted additional donated documents.This display consisted of the Ten Commandments along with other historical documents.” Brief for Petitioners 2. Like the District Court, we find our analysis applies equally to either format.

 The court also found that the display had the effect of endorsing religion: “Removed from their historical context and placed with other documents with which the only common link is religion, the documents have the undeniable effect of endorsing religion.” 96 F. Supp. 2d, at 688; 96 F. Supp. 2d, at 699-700.

 Before the District Court issued the modified injunction, the Counties removed the label of “King James Version” and the citation to Exodus. 145 F. Supp. 2d 845, 847 (ED Ky. 2001).

 The court also found that the effect of the third display was to endorse religion because the “reasonable observer will see one religious code placed alongside eight political or patriotic documents, and will understand that the counties promote that one religious code as being on a par with our nation’s most cherished secular symbols and documents” and because the “reasonable observer [would know] something of the controversy surrounding these displays, which has focused on only one of the nine framed documents: the Ten Commandments.” Id., at 851, 852.

 The Sixth Circuit did not decide whether the display had the impermissible effect of advancing religion because one judge, having found the display motivated by a religious purpose, did not reach that issue. 354 F. 3d, at 462 (Gibbons, J., concurring). The other judge in the majority concluded that a reasonable observer would find that the display had the effect of endorsing religion given the lack of analytical connection between the Commandments and the other documents in the display, the courthouse location of the display, and the history of the displays. Id., at 458-459. The dissent found no effect of endorsement because it concluded that a reasonable observer would only see that the County had merely acknowledged the foundational role of the Ten Commandments rather than endorsed their religious content. Id., at 479-480.

 Stone v. Graham, 449 U. S. 39, 41 (1980) (per curiam); Wallace v. Jaffree, 472 U. S. 38, 56-61 (1985); Edwards v. Aguillard, 482 U. S. 578, 586-593 (1987); Santa Fe, 530 U. S., at 308-309.

 At least since Everson v. Board of Ed. of Ewing, 330 U. S. 1 (1947), it has been clear that Establishment Clause doctrine lacks the comfort of categorical absolutes. In special instances we have found good reason to *860 hold governmental action legitimate even where its manifest purpose was presumably religious. See, e. g., Marsh v. Chambers, 463 U. S. 783 (1983) (upholding legislative prayer despite its religious nature). No such reasons present themselves here.

 Moreover, Justice O’Connok provided the fifth vote for the Lynch majority, and her concurrence emphasized the point made implicitly in the majority opinion that a secular purpose must be serious to be sufficient. 465 U. S., at 691 (The purpose inquiry “is not satisfied ... by the mere existence of some secular purpose, however dominated by religious purposes”).

 Stone found the sacred character of the Ten Commandments preeminent despite an avowed secular purpose to show their “adoption as the fundamental legal code of Western Civilization and the Common Law —” 449 U. S., at 39-40, n. 1 (internal quotation marks omitted). And the Ab-ington Court was unconvinced that music education or the teaching of literature were actual secular objects behind laws requiring public school teachers to lead recitations from the Lord’s Prayer and readings from the Bible. 374 U. S., at 273.

 The dissent nonetheless maintains that the purpose test is satisfied so long as any secular purpose for the government action is apparent. Post, at 901-902 (opinion of SCAUA, J.). Leaving aside the fact that this position is inconsistent with the language of the cases just discussed, it would leave the purpose test with no real bite, given the ease of finding some secular purpose for almost any government action. While heightened deference to legislatures is appropriate for the review of economic legisla *866 tion, an approach that credits any valid purpose, no matter how trivial, has not been the way the Court has approached government action that implicates establishment.

 One consequence of taking account of the purpose underlying past actions is that the same government action may be constitutional if taken in the first instance and unconstitutional if it has a sectarian heritage. This presents no incongruity, however, because purpose matters. Just as Holmes’s dog could tell the difference between being kicked and being stumbled over, it will matter to objective observers whether posting the Commandments follows on the heels of displays motivated by sectarianism, or whether it lacks a history demonstrating that purpose. The dis *867 sent, apparently not giving the reasonable observer as much credit as Holmes’s dog, contends that in practice it will be “absur[d]” to rely upon differences in purpose in assessing government action. Post, at 907. As an initial matter, it will be the rare case in which one of two identical displays violates the purpose prong. In general, like displays tend to show like objectives and will be treated accordingly. But where one display has a history manifesting sectarian purpose that the other lacks, it is appropriate that they be treated differently, for the one display will be properly understood as demonstrating a preference for one group of religious believers as against another. See supra, at 860-861. While posting the Commandments may not have the effect of causing greater adherence to them, an ostensible indication of a purpose to promote a particular faith certainly will have the effect of causing viewers to understand the government is taking sides.

 We note that the only factor in the preliminary injunction analysis that is at issue here is the likelihood of the ACLU’s success on the merits.

 Although the Counties point out that the courthouses contained other displays besides the Ten Commandments, there is no suggestion that the Commandments display was integrated to form a secular display.

 In Stone, the Commandments were accompanied by a small disclaimer: “The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States.” 449 U. S., at 39-40, n. 1 (internal quotation marks omitted).

 The Counties’ other purposes were:
“to erect a display containing the Ten Commandments that is constitutional; ... to demonstrate that the Ten Commandments were part of the foundation of American Law and Government; ... [to include the Ten Commandments] as part of the display for their significance in providing ‘the moral background of the Declaration of Independence and the foundation of our legal tradition.’ ” 145 F. Supp. 2d, at 848 (some internal quotation marks omitted).

 Following argument in this case, in which the resolutions were discussed, the McCreary and Pulaski County Boards did repeal the resolutions, acts of obviously minimal significance in the evolution of the evidence.

 The Counties argue that the objective observer would not continue to believe that the resolution was in effect after the third display went up because the resolution authorized only the second display. But the resolution on its face is not limited to any particular display. On the contrary, it encourages the creation of a display with the Ten Commandments that also includes such documents as “the National anthem . . . the National Motto ... the preamble to the Kentucky Constitution[,] the Declaration of Independence [and] the Mayflower Compact . . . without censorship because of any Christian or religious references.” Def. Exh. 1, at 1. The third display contains all of these documents, suggesting that it fell within the resolutions as well. The record does not indicate whether the resolutions were posted with the third display.

 The Counties have now backed away from their broad assertion that the Commandments provide “the” moral background of the Declaration of Independence, and now merely claim that many of the Commandments “regarding murder, property, theft, coveting, marriage, rest from labor and honoring parents are compatible with the rights to life, liberty and happiness.” Brief for Petitioners 10, n. 7.

 The Counties grasp at McGowan v. Maryland, 366 U. S. 420 (1961), but it bears little resemblance to this case. As noted supra, at 861, McGowan held that religious purposes behind centuries-old predecessors of Maryland’s Sunday laws were not dispositive of the purposes of modern Sunday laws, where the legislature had removed much of the religious reference in the laws and stated secular and pragmatic justifications for them. 366 U. S., at 446-452. But a conclusion that centuries-old purposes may no longer be operative says nothing about the relevance of recent evidence of purpose, and this case is far more like Santa Fe, with its evolution of a school football game prayer policy over the course of a single lawsuit. Like that case, “[t]his [one] comes to us as the latest step in developing litigation brought as a challenge to institutional practices that unquestionably violated the Establishment Clause.” 530 U. S., at 315 (describing the evolution of the school district’s football prayer policy). Thus, as in Santa Fe, it makes sense to examine the Counties’ latest action “in light of [their] history of” unconstitutional practices. Id., at 309.

 The dissent notes that another depiction of Moses and the Commandments adorns this Court’s east pediment. Post, at 906. But as with the courtroom frieze, Moses is found in the company of other figures, not only great but secular.

 The dissent also maintains that our precedents show that a. solo display of the Commandments is a mere acknowledgment of religion “on par with the inclusion of a créche or a menorah” in a holiday display, or an official’s speech or prayer, post, at 905. Whether or not our views would differ about the significance of those practices if we were considering them as original matters, they manifest no objective of subjecting individual lives to religious influence.comparable to the apparent and openly acknowledged purpose behind posting the Commandments. Créches placed with holiday symbols and prayers by legislators do not insistently call for religious action on the part of citizens; the history of posting the Command *878 ments expressed a purpose to urge citizens to act in prescribed ways as a personal response to divine authority.

 The dissent cites material suggesting that separationists like Jefferson and Madison were not absolutely consistent in abstaining from official religious acknowledgment. Post, at 888. But, a record of inconsistent historical practice is too weak a lever to upset decades of precedent adhering to the neutrality principle. And it is worth noting that Jefferson thought his actions were consistent with nonendorsement of religion and Madison regretted any backsliding he may have done. Lee v. Weisman, 505 U. S. 577, 622-625 (1992) (SOUTER, J., concurring). “Homer nodded.” Id., at 624, n. 5 (corrected in erratum at 535 U. S. n).

 There might, indeed, even have been some reservations about monotheism as the paradigm example. It is worth noting that the canonical biography of George Washington, the dissent’s primary exemplar of the monotheistic tradition, calls him a deist. J. Flexner, George Washington: Anguish and Farewell (1793-1799), p. 490 (1972) (“Washington’s religious belief was that of the enlightenment: deism”). It would have been odd for the First Congress to propose an Amendment with Religion Clauses that took no account of the President’s religion. As with other historical matters pertinent here, however, there are conflicting conclusions. R. Brookhiser, Founding Father: Rediscovering George Washington 146 (1996) (“Washington’s God was no watchmaker”). History writ small does not give clear and certain answers to questions about the limits of “religion” or “establishment.”