Walter F. BARTON and Betty E. Barton, Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 88-8844.

United States Court of Appeals, Eleventh Circuit.

Jan. 29, 1990.

---

Roger A. Pies, Morgan, Lewis & Bockius, Washington, D.C., for petitioners.

Gary R. Allen, Chief, William S. Rose, Jr., William S. Estabrook, Charles Bricken, Appellate Section, Tax Div., Dept. of Justice, Washington, D.C., for respondent.

Before CLARK and EDMONDSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

CLARK, Circuit Judge:

In this appeal from the United States Tax Court, we are asked to untangle a complicated "sale/lease-back" transaction to determine whether, during 1982, the appellants were "at risk" within the meaning of Section 465(b) of the Internal Revenue Code of 1954, as amended. Based on a stipulated factual record, the Tax Court found that the appellants were not at risk and upheld the Commissioner's deficiency assessment. Having extensively analyzed the facts as stipulated by the parties, as understood by the Tax Court, and as presented by the parties on appeal, we find that the Tax Court erred in refusing to consider relevant evidence and based its ruling on a misunderstanding of the facts of the case. Furthermore, we are unable to rectify the misunderstanding because the factual record is incomplete. Therefore, we vacate the Tax Court's decision and remand this case for further proceedings consistent with this opinion.

This case involves multi-layered contractual relations among five parties that arise from the purchase and lease of $700,000 worth of computer equipment. It appears from the record that as of October 30, 1978, St. Joseph Leasing Corporation ("Leasing") was the sole owner of the computer equipment. (Exh. R–18) By June 26, 1981, Leasing had leased all of the computer equipment to TRW, Inc.[1] (Exh. R–18) From that point on, the computer equipment has apparently remained in the possession of TRW, Inc., which uses it in its business. Although the documents relating to this transfer of ownership are not in the record, it appears that sometime after June 26 and on or before November 25, 1981, Leasing sold its ownership interest in the computer equipment to St. Joseph Equity Corporation ("Equity"). On November 25, 1981, Equity sold its ownership interest in the computer equipment to petitioner Walter F. Barton, in return for $20,000 cash, a full-recourse Promissory Note for $110,000, and a non-recourse Installment Note for $570,000. (Exh. G–7, H–8, I–9,

---

1. TRW leased the computer equipment from Leasing under two separate leases. These leases are referred to throughout this opinion as "the TRW lease."

E–5) On that same day Mr. Barton leased the computer equipment back to Equity. (Exh. K–11)

Pursuant to the terms of the Installment Note and the lease agreement between Mr. Barton and Equity, Mr. Barton was required to make 96 monthly Installment Note payments of $10,102.60 and Equity was required to make 96 monthly lease payments of $10,535.93. (Petitioner's Brief, p. 5; Commissioner's Brief, p. 4–5) Equity's monthly obligation to Mr. Barton therefore exceeded Mr. Barton's monthly obligation to Equity by $433.33. Instead of tendering checks to each other monthly, Equity offset Mr. Barton's obligation under the Installment Note, and paid Mr. Barton $2,599.98 (six times $433.33) every six months.

■ The parties agree that Mr. Barton was at-risk for the amount of the full recourse Promissory Note. The question of whether he was at-risk for the amount of the Installment Note would not have arisen but for a December, 1982 amendment to the Installment Note. As noted above, the Installment Note was originally written to be a non-recourse obligation, and thus, Mr. Barton was not originally personally at-risk for the $570,000. The December, 1982 amendment (the "Amendment") was intended to convert a portion of the Installment Note debt to recourse debt. Specifically, it provided that during certain years the non-recourse language of the Installment Note would only apply to amounts in excess of specified amounts, as follows:

| | |
|---|---|
| December 31, 1982 | $ 91,000 |
| December 31, 1983 | $201,000 |
| December 31, 1984 | $299,000 |
| December 31, 1985 | $383,000 |
| December 31, 1986 | $305,000 |
| December 31, 1987 | $216,000 |
| December 31, 1988 | $113,000 |
| December 31, 1989 | $ 5,000 |

Paragraph 2(ii) of the Amendment further provided:

The Seller [Equity] and its Assignee ... (ii) agree that if either: (a) the corporate bond rating of the lessee to whom the Seller is leasing the Equipment as published by Moody's Investors Service, Inc. falls below such lessee's rating as of the Commencement Date of the Original Term of the Lease; or (b) the net worth of the lessee to whom the Seller is leasing the Equipment falls below such lessee's net worth as set forth in the most recent audited financial statement available as of the Commencement Date of the Original Term of the Lease, the Buyer may rescind this Amendment, in whole or in part, by tendering written notice to the Seller by registered mail, return receipt requested.

(Exh. F–6) This paragraph clearly gives Mr. Barton the option to relieve himself of the recourse liability for the amounts listed above upon the happening of one of two events. The Commissioner and the Tax Court take the position that this "opt-out" provision serves to prevent Mr. Barton from ever being at-risk, while Mr. Barton contends that the "opt-out" provision does not protect him in two "worst case scenarios" and thus he was at-risk for the listed amounts.

Mr. Barton and the Commissioner agree that if the word "rescind" in the Amendment was intended to mean prospective rescission only, then the Amendment would not operate as a stop-loss agreement, because Mr. Barton would still be at-risk for the listed amounts prior to the date of rescission. On the other hand, if "rescind" means that Mr. Barton could be relieved of all personal liability, past, present and future, then the Amendment would operate as a stop-loss agreement. Mr. Barton argues on appeal that the Tax Court erred in refusing to consider evidence that he and Equity intended for the word "rescind" to allow prospective rescission only. The Tax Court stated in a footnote: "In view of our conclusion and discussion in this opinion we do not consider it necessary to discuss the various arguments made by the parties ... such as whether the parol evidence rule would bar testimony as to the intent of the parties with respect to the provisions and whether "rescind" as used in the arrangement means 'rescind' or 'revoke'." Nevertheless, the Tax Court necessarily determined that the word "rescind" allowed re-

scission *ab initio,* because the Tax Court held:

> [T]he net effect of the Amendment is to protect petitioner from economic loss because the only circumstance under which he realistically would be called upon to pay is where the end-user, TRW, would not or could not pay on its obligation and that is exactly the circumstance in which petitioner could get out of his recourse liability.

Tax Court Memorandum Opinion, p. 14.

The parties have stipulated that Virginia law is the applicable law to the construction of the Amendment. Under Virginia law, extrinsic (parol) evidence is admissible to determine the meaning of ambiguous contract terms. *See Renner Plumbing, Heating and Air Conditioning, Inc. v. Renner,* 225 Va. 508, 303 S.E.2d 894 (Va. 1983); *Reed v. Dent,* 194 Va. 156, 72 S.E.2d 255 (1952); *Sunbury Textile Mills, Inc. v. Commissioner,* 585 F.2d 1190 (3d Cir. 1978). The Commissioner concedes that the word "rescind" is ambiguous, but argues that the Tax Court did consider the surrounding circumstances when it was determining the effect of the Amendment, because the Tax Court made specific reference to the contractual relations of all the parties before and after the execution of the Amendment. The Tax Court offers no valid explanation for its refusal to consider the evidence offered by Mr. Barton regarding the parties' intentions as to the meaning of the word "rescind". Because the meaning and effect of the Amendment is crucial to the determination of whether Mr. Barton was ever at-risk, we must remand this issue so that the Tax Court may receive and consider all relevant evidence the parties have to offer with respect to the meaning of the word "rescind" in the Amendment.

■ Mr. Barton also argues on appeal that even if the Tax Court properly determined that the word "rescind" was intended to allow rescission *ab initio,* the Tax Court erred in finding that the "opt-out" provision in the Amendment would protect him from all potential personal liability on the Installment Note. To properly determine whether Mr. Barton was ever at-risk for the listed amounts, we must fully understand the contractual relations among the parties, because we must determine whether Mr. Barton could ever be in default under the Installment Note such that the holder of the Installment Note could hold him personally liable for the recourse portion.

The transactions between Leasing, TRW, Equity and Mr. Barton described above provide only the basic framework of the contractual relations among them. Contemporaneously with the purchase and lease-back of the computer equipment between Mr. Barton and Equity, several additional assignments were made. The stipulation of facts provided to the Tax Court and the Tax Court's understanding of the facts are not consistent with the documents. For example, the documents show that Equity assigned to Mr. Barton its interest in the TRW lease as security for Equity's obligation to make lease payments to Mr. Barton. (Exh. S–19) As security for his obligation to make payments under the Installment Note, Mr. Barton assigned his interest in the monthly lease payments due to him from Equity and his interest in the TRW lease back to Equity. (Exh. T–20, AJ–36) The supplemental stipulation of facts states only that:

> d. [Mr. Barton] assigned to Equity all [his] rights under the lease between [Mr. Barton] and Equity.
>
> f. Equity assigned its interest in the lease with TRW, Inc. to [Mr. Barton].
>
> g. [Mr. Barton] assigned [his] interest in the lease with TRW, Inc. to Equity.

Thus, although the documents appear to show that the interests were not assigned outright, but rather were assigned *as security for* certain obligations, the parties appear to have stipulated that the assignments were outright assignments. However, their arguments on appeal show that they consider these to be "collateral" assignments, that is assignments as security for obligations, not outright assignments.

This sort of discrepancy also appears in the various versions of the facts presented in relation to the fifth party involved in this

case. Describing the relationship of this fifth party to the other four is virtually impossible, because the record is incomplete, and the parties present inconsistent versions of this fifth party's relationship to the case. It appears that when Equity purchased the computer equipment from Leasing, Leasing assigned an interest in its lease of the computer equipment to TRW to Equity. Whether this was a security interest only, or an outright assignment of Leasing's interest in the TRW lease is impossible to determine, because the documents relating to the transfer of ownership of the computer equipment from Leasing to Equity are not in the record. Furthermore, although it would seem logical that having sold the computer equipment to Equity, Leasing would also make an outright assignment of its interest in the TRW lease to Equity, the documents sometimes refer to Leasing as the lessor (Exh. H–8), and sometimes to Equity as the lessor (Exh. J–10). This inconsistency becomes important when attempting to determine how the fifth party in this case relates to Mr. Barton.

On July 20, 1982, Leasing sold its interest in various lease payments to·Citicorp Industrial Credit, Inc. ("Citicorp"). The documents relating to this sale show that Leasing's interest in the TRW lease was included in the sale. The problem is that other documents indicate that Equity at some point in time had an interest in the TRW lease, because Equity assigned that interest to Mr. Barton as security for its obligations to Mr. Barton under its lease of the equipment from him. No document in the record shows that Equity ever assigned an interest in the TRW lease back to Leasing. Therefore, it is unclear what interest Leasing actually had in the lease payments that TRW owed under the TRW lease. The Commissioner sometimes indicates that Equity was receiving the payments under the TRW lease (Commissioner's Brief, p. 38), and at other times indicates that Leasing was receiving those payments (Commissioner's Brief, p. 42). Also in connection with the sale of lease payments to Citicorp, Leasing agreed to act as a collection agent for Citicorp with respect to the lease payments. As security for that obligation, Leasing assigned its interest in various installment notes to Citicorp. Among these was Leasing's interest in the Installment Note given by Mr. Barton to Equity when he purchased the computer equipment. Leasing obtained an interest in the Installment Note when Equity assigned its interest in the Installment Note to Leasing as security for Equity's obligations to Leasing under the purchase agreement in which Equity purchased the computer equipment from Leasing. It appears then that, at the end of the day on July 20, 1982, Citicorp had an interest in the Installment Note.

Both Mr. Barton and the Commissioner argue on appeal that Citicorp only had a security interest in the Installment Note, and that Equity remained the beneficial owner of the Note and continued to be entitled to receive payments under the Note. The documents track this fairly clearly. However, in the supplemental stipulation of facts, the parties state that Equity assigned the Installment Note to Leasing, and that Leasing assigned the Note to Citicorp. No explanation that these assignments were assignments of a *security interest*, rather than outright assignments, appears in the stipulation of facts. The Tax Court erroneously concluded that Citicorp became the holder of the Installment Note. The Tax Court also concluded that the lease payments from TRW under the TRW lease, which were assigned to Citicorp, somehow managed to offset Mr. Barton's obligation under the Installment Note such that TRW's monthly lease payments served to discharge Mr. Barton's monthly obligation to make payments under the Installment Note. It is unclear how the Tax Court reached this conclusion, but it may have been misled by the stipulations of the parties with respect to the assignments between Equity and Mr. Barton relating to the TRW lease. *See supra,* page 309. Nevertheless, both Mr. Barton and the Commissioner agree on appeal that TRW's lease payments did not serve to discharge Mr. Barton's obligations under the Installment Note, because Equity, and not Citicorp, remained the holder of the

Installment Note throughout this myriad of assignments.

In reaching its decision the Tax Court relied on this erroneous understanding of the facts. Unfortunately, identifying the true holder of the Installment Note does not aid us in evaluating the arguments of the parties. A complete explanation of the parties' arguments is almost impossible at this point, because they do not agree between themselves on what the facts are, and at times appear to change the facts to suit their arguments. Mr. Barton argues that there are two possible situations in which he could be held personally liable for the listed amounts. The first involves a default by Equity in its obligation to make monthly lease payments to Mr. Barton, and the second involves a default by TRW in its obligation to make monthly lease payments under the TRW lease. Both Mr. Barton and the Commissioner argue that a default by TRW would somehow give Citicorp an opportunity to pursue Mr. Barton on the note. However, they dispute the extent of the interest Citicorp has in the Installment Note. Mr. Barton claims that a default by TRW causes Mr. Barton to be in default on the Installment Note, while the Commissioner claims that a default by TRW only allows Citicorp to become the holder of Leasing's security interest in the Installment Note.

Try as we might, we cannot properly evaluate the merits of these arguments based on the current condition of the factual record. Because Mr. Barton and the Commissioner disagree as to the relationships among the parties, we are forced to make an independent evaluation of the documents. Several crucial documents do not appear in the record, and thus we are unable resolve this issue on appeal. On remand, the parties must provide the court with the documents relating to Equity's purchase of the computer equipment from Leasing, including documents showing what interest, if any, Equity obtained in the TRW lease. Additionally, the parties must explain what interest Leasing had in the TRW lease after selling the computer equipment to Leasing, and at the time that it sold its interest in the TRW lease to Citicorp. Only when these and any other missing links in the documentary chain have been provided, can the Tax Court make a proper ruling in this case.

Because the Tax Court failed to consider relevant evidence on an issue which might be dispositive of the case, and because the Tax Court based its analysis on a misunderstanding of the facts of the case, the decision of the Tax Court is VACATED, and the case is REMANDED for further proceedings consistent with this opinion. We remand the case for the Tax Court to start with a clean slate. None of the factual statements in this opinion are binding upon the Tax Court. Because of the complexity of the transactions, we suggest to the Tax Court that it not proceed upon a stipulation of facts by the parties nor upon the documents alone. To give meaning to the transactions, it will be necessary for the Tax Court to take evidence from the persons who structured the various transactions.

VACATED and REMANDED.