[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-10341

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 25, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-02325-CV-CC-1

JEFFREY MICHAEL SELMAN,
KATHLEEN CHAPMAN,
JEFF SILVER,
PAUL MASON,
TERRY JACKSON,

Plaintiffs-Appellees,

DEBRA ANNE POWER,

Plaintiff,

versus

COBB COUNTY SCHOOL DISTRICT,
COBB COUNTY BOARD OF EDUCATION,
JOSEPH REDDEN, Superintendent,

Defendants-Appellants.

_____

No. 05-11725

_____

D.C. Docket No. 02-02325-CV-CC-1

JEFFREY MICHAEL SELMAN,
KATHLEEN CHAPMAN,
JEFF SILVER,
PAUL MASON,
TERRY JACKSON,

                                              Plaintiffs-Appellees,

DEBRA ANNE POWER,

                                              Plaintiff,


                              versus


COBB COUNTY SCHOOL DISTRICT,
COBB COUNTY BOARD OF EDUCATION,
JOSEPH REDDEN, Superintendent,

                                              Defendants-Appellants.


_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

**(May 25, 2006)**

Before CARNES, HULL and PRYOR, Circuit Judges.

CARNES, Circuit Judge:

    This is the Cobb County, Georgia evolution sticker case.  It involves a

message of thirty-three words on a sticker that the defendant school district and

board of education had affixed inside the front cover of some science textbooks used in the public schools of the county. The plaintiffs, all of whom had children in those schools, brought suit claiming that the sticker violated the Establishment Clause of the First Amendment. Following a bench trial, the district court agreed with the plaintiffs and entered a permanent injunction ordering the defendants to remove the sticker from the textbooks. After being denied a stay, the defendants complied with the injunction by removing the stickers from the textbooks, but they have appealed asking us to reverse the district court's judgment.

Whether we should reverse or affirm the judgment depends on the evidence that was before the district court, and we cannot tell from the record what that evidence was. Everyone agrees that some evidence presented to the district court has been omitted from the record on appeal, but the attorneys have not been able to identify what was omitted. The problems presented by a record containing significant evidentiary gaps are compounded because at least some key findings of the district court are not supported by the evidence that is contained in the record. We have concluded that the unfilled gaps in the record, coupled with the problematic nature of some of the district court's factfindings, prevent proper appellate review of the merits of the important constitutional issues raised in this case. For reasons we will explain, we have decided the best thing to do is remand

3

the case to the district court in order for it to conduct new evidentiary proceedings and enter a new set of findings based on evidence in a record that we will be able to review.

The difficulty of an uncertain record and missing evidence is especially vexing in an Establishment Clause case because in this area of the law the devil is in the details. Facts and context are crucial and they, of course, must be determined from the evidence, which presupposes that a court knows what the evidence is. The Supreme Court recently has reiterated that the "touchstone" for Establishment Clause analysis is "that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.'" McCreary County, Ky. v. ACLU, ___ U.S. ___, 125 S. Ct. 2722, 2733 (2005) (quoting Epperson v. Arkansas, 393 U.S. 97, 104, 89 S. Ct. 266, 270 (1968)) (other citations omitted). Because neutrality cannot be clearly defined for all times in absolute terms, "[e]ach value judgment under the Religion Clauses must therefore turn on whether particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so." Walz v. Tax Comm'n of N.Y., 397 U.S. 664, 669, 90 S. Ct. 1409, 1412 (1970); see also McCreary, ___ U.S. at ___, 125 S. Ct. at 2733 n.10 ("At least since Everson v. Board of Ed. of Ewing . . . it has been clear that Establishment Clause doctrine

lacks the comfort of categorical absolutes.").  Knowledge of the particular facts and specific circumstances is essential to a determination of whether the governmental acts in question are religiously neutral.  See McCreary, ___ U.S. at ___, 125 S. Ct. at 2738 (observing that "under the Establishment Clause detail is key"); see also Glassroth v. Moore, 335 F.3d 1282, 1288 (11th Cir. 2003) (stating that "Establishment Clause challenges are not decided by bright-line rules, but on a case-by-case basis with the result turning on the specific facts").

## I.

We will begin with the facts that appear to be undisputed.  In 1995 the Cobb County School District had an official policy concerning the instruction of students on "Theories of Origin."  The policy acknowledged that "some scientific accounts of the origin of human species as taught in public schools are inconsistent with the family teachings of a significant number of Cobb County citizens."  It provided that "the instructional program and curriculum of the school system shall be planned and organized with respect for these family teachings."

An accompanying regulation explained how the policy was to be implemented.  The 1995 regulation stated that out of  "respect for the family teachings of a significant number of Cobb County citizens," the subject of the origin of human species would not be taught in the elementary and middle schools,

and instruction in it would not be mandatory in the district's high schools. The regulation did state that elective courses on alternative theories of the origin of human species, including creation theory, would be offered to high school students and noted in curriculum catalogs and listings. In compliance with the 1995 policy and regulation, the school district provided students with science textbooks only after any section containing material on evolution had been torn out of the books.

The 1995 policy and regulation were still in place in the fall of 2001 even though they conflicted with the state curriculum requirements mandating the teaching of evolution. At the same time, the school district was beginning the process of adopting new science textbooks. Textbooks are adopted by subject matter on a seven year cycle, and it was time for new science textbooks in 2002. The State Board of Education chooses a group of recommended books, and the administration (including but not limited to the Cobb County Superintendent of Education) forms a committee to review the books, and that committee recommends to the school board which books to select. When the committee began its science textbook selection process in fall 2001, it was concerned that the books it recommended might conflict with the 1995 school district policy regarding instruction on theories of origin. Members of the committee raised

concerns about that with the administration. In response to those concerns, the administration began to review the policy and regulation.

One of the textbooks the committee considered was Biology by Kenneth R. Miller and Joseph Levine. That 1,100-page book contains 101 pages—a whole unit—on evolution. The textbook selection committee, including North Cobb High School science department chair Dr. Wes McCoy, believed that Biology was the best available textbook and for that reason recommended that it be adopted for high school Biology I 102. After the committee made its textbook recommendations, the administration put the books on display for parental review and comment from February 18, 2002 to March 8, 2002. Forms were provided so that parents could submit comments about the textbooks to the school district. The comment forms were presented to the superintendent and the textbook committee. They reviewed the comments and the textbooks in question and then determined that the textbooks should be presented to the board as recommended by the textbook adoption committee.

It is unclear whether the parental comment forms were also sent to the board, but after parents had an opportunity to review and comment on the textbooks, some board members expressed concerns that their constituents wanted science textbooks that also presented alternate theories of the origin of life. In a

school board meeting, the topics of intelligent design, creation science, and creationism were discussed. The board's legal counsel advised it that intelligent design could not be included in science textbooks. In order to accommodate some parents' concerns about instruction on evolution, the board asked its attorney to develop some language that would address these concerns without violating the Constitution.

Legal counsel drafted a statement to be placed in the textbooks containing material on evolution. By unanimous vote, the school board conditioned the adoption of those new textbooks on the inclusion of that statement in the form of a sticker affixed inside the front cover of the textbooks. The sticker stated:

> This textbook contains material on evolution. Evolution is a theory, not a fact, regarding the origin of living things. This material should be approached with an open mind, studied carefully, and critically considered.

> *Approved by*
> *Cobb County Board of Education*
> *Thursday, March 28, 2002*

**II.**

On August 21, 2002, Jeffrey Michael Selman filed suit against the Cobb County School District and the Cobb County Board of Education.[1] The lawsuit was filed before the school board adopted a revised theories of origin policy on September 26, 2002, and before the administration adopted on January 8, 2003 a revised regulation designed to implement the new policy. Both the new policy and the new regulation provided that evolution would be taught in Cobb County science classrooms and that religion would not be.

Selman's lawsuit challenged the placement of the sticker in the science textbooks as a violation of the Establishment Clause of the First Amendment of the United States Constitution and as a violation of article I, section 2, paragraph 7 of the Georgia State Constitution. Selman did not challenge the revised policy or regulation. In fact, about a month after the revised policy was adopted, Selman sent a letter to the school board stating that the board was moving in the right direction in keeping faith-based beliefs out of science education.

---

[1] An amended complaint added as plaintiffs Debra Ann Power, Kathleen Chapman, Jeff Silver, Paul Mason, and Terry Jackson. The court later issued an order granting a consent motion to remove Power as a plaintiff.

The complaint initially included Cobb County School Superintendent Joseph Redden as a defendant, but the parties eventually stipulated that summary judgment was proper for all claims against Redden, and the court dismissed him as a defendant.

A motion to intervene was filed by two parents who wanted to expand the lawsuit to include a Free Exercise Clause challenge to the failure of the defendants to include alternative theories of origin in the curriculum. The plaintiffs took no position on that motion to intervene, but the defendants opposed it. They argued that the case presented by the lawsuit was not about the subject matter taught in classrooms but was solely concerned with whether the insertion of the stickers in the science textbooks constituted an establishment of religion or violated related Georgia constitutional provisions. The court denied the motion to intervene.

After discovery, the defendants filed a motion for summary judgment, which the district court denied. In doing so, the court looked to the Lemon test, under which a government-sponsored message violates the Establishment Clause if: (1) it does not have a secular purpose, (2) its principal or primary effect advances or inhibits religion, or (3) it creates an excessive entanglement of the government with religion. Glassroth, 335 F.3d at 1295 (citing Lemon v. Kurtzman, 403 U.S. 602, 612–13, 91 S. Ct. 2105, 2111(1971)). The court first analyzed the school board's purpose in adopting the sticker. In discussing the purpose behind the sticker, the court's order denying summary judgment had this to say:

> Among the reasons that Board members voted to place the Sticker in textbooks were parent concerns regarding the content of the new textbook and the strengthening of evolution instruction, parent concerns regarding the imbalanced presentation of theories of origin, teacher concerns regarding the teaching of theories of origin, their own concerns that the science textbooks did not address scientific controversy regarding evolution, their own desire to assure parents that the enhanced evolution instruction would not be unduly offensive to their philosophical or religious beliefs, and their own desire to promote critical thinking.

The court also stated that "[w]hile the Sticker, on its face, is neutral towards religion and contains no religious content, the statement is not clearly neutral towards evolution." The court found that, in the mind of a reader, the language of the sticker might create doubts about evolutionary theory, and, therefore, the context and history of the sticker's language had to be evaluated in order to determine whether the sticker was constitutional.

The "essence of the dispute," according to the court, was that "[w]hile Defendants argue that they seek only to accommodate religious beliefs, Plaintiffs argue that Defendants are promoting and have the intent to promote religion by encouraging the teaching of intelligent design and creationism." The court agreed with the defendants that "reducing offense to students and parents is a legitimate, secular purpose." It also thought that some parents may have engaged in

11

"trickery" by persuading members of the school board that they were concerned that alternative scientific theories of origin were not being presented to their children when, in fact, the parents were secretly advancing a religious cause. The court, however, refused to impute any hidden motives of the parents to the school board members.

The court concluded that the plaintiffs had failed to create a genuine issue of material fact disputing the board's secular purpose, which the court identified as encouraging critical thinking and reducing offense that students might experience as a result of the "strengthening and enhancement of evolution instruction in Cobb County schools." On that basis the court ruled, at the summary judgment stage, that the board did not act with the purpose of promoting or advancing religion in placing the sticker in the science textbooks.

The court did find, however, that there was a genuine issue of material fact as to the effect and entanglement prongs of Lemon. It noted the plaintiffs' contentions that the sticker arguably disavows evolution and encourages students' consideration of other alternatives, and on that basis found that a genuine issue of material fact existed as to the effects prong of the Lemon test. The court stated that excessive entanglement might occur because the sticker could encourage students to use the science classroom as a forum to consider and discuss religious

12

theories as alternatives to evolutionary theory. Having concluded that genuine issues remained as to the effect and entanglement prongs of the Lemon test, the court denied defendants' motion for summary judgment.

In response to the defendants' motion for summary judgment, plaintiffs had filed affidavits from four scientists who had not been identified as experts. In its order denying defendants' motion for summary judgment, the court also denied defendants' motion to strike the affidavits. It did rule, however, that those scientists' opinions about what had motivated the board members to adopt the sticker were based on assumptions not supported by the record, making it "untrustworthy evidence" that would not be considered.

Before trial, defendants filed a motion to exclude the testimony of a number of witnesses, including those same four scientists, who had been identified as witnesses by plaintiffs in the consolidated pretrial order. Defendants contended that they were not fact witnesses and had not been properly qualified as experts in the case. The court issued an order granting in part and denying in part the defendants' motion. It granted the motion to exclude at trial the testimony of the four scientists whose affidavits had been submitted by the plaintiffs in opposition to the defendants' motion for summary judgment. The court did so because the plaintiffs had violated Fed. R. Civ. P. 26 by failing to properly designate the

13

scientists as expert witnesses and by failing to make the disclosures required under that rule. It reasoned that the scientists would have testified as experts because the gist of their testimony would have been that evolution is a fact, not a theory.

The court did rule that Dr. Kenneth Miller, co-author of Biology, would be permitted to testify for the plaintiffs, but only as a fact witness not as an expert. Plaintiffs also wanted to use Dr. McCoy as a witness to testify, in their words, about "'evolution as fact and the experience of the disclaimer on classroom instruction.'" The court decided not to prevent Dr. McCoy from testifying at trial and said that it would rule on the admissibility of his testimony at that time.[2]

The court held a four-day bench trial in November of 2004. It issued an order on January 13, 2005, concluding that the sticker adopted by the school board violated the Establishment Clause, as well as the Georgia Constitution, and issued an injunction that required the defendants to remove the sticker from all textbooks and permanently enjoined them from disseminating the sticker in any form. Selman v. Cobb County Sch. Dist., 390 F. Supp. 2d 1286, 1313 (N.D. Ga. 2005). The findings of fact and conclusions of law contained in the court's order were

_____

[2] During the trial, on direct examination Dr. McCoy testified that he teaches evolution as a theory and as a fact. There was no objection to this statement. In its order ruling on the merits, the court noted that because defendants had not objected at trial to the testimony of either Dr. McCoy or Dr. Moreno (another scientist who testified for the plaintiffs), the court would consider all of the testimony offered by both witnesses. Selman v. Cobb County Sch. Dist., 390 F. Supp. 2d 1286, 1289 n.4 (N.D. Ga. 2005).

14

explicitly based on: "the Court's review of the evidence presented at trial, the testimony of the witnesses at trial, the parties' trial briefs, the parties' proposed findings of fact and conclusions of law, the other documents and evidence in the record, and the applicable law." Id. at 1288. The court also considered four amicus briefs that had been filed. Id. at 1288 n.2.

In its findings of fact, the court considered the responses that some parents had made to the science textbooks. The court noted that "[a]lthough the evidence shows only three parents submitted official comment forms regarding the textbooks, the School Board heard complaints from several parents that the textbooks did not present the theories of origin in a fair manner." Id. at 1291. The court determined that school board member Lindsey Tippins called the board's attention to the concerns of parents who objected to the new textbooks and that, as a result, some members of the board asked legal counsel to draft language that would address those concerns without violating the Constitution. Id. at 1292. Counsel drafted the language which, without change, became the wording of the sticker. Id.

The court found that controversy had arisen after the board had adopted the sticker when "numerous citizens, organizations, churches, and academics from around the country contacted the School Board and individual School Board

15

members to praise them for their decision to open the classroom to the teaching and discussion of creationism and intelligent design." Id. at 1294–95. At the same time, however, "the School Board also received letters in which individuals and groups expressed dismay at the inclusion of the Sticker in the textbooks." Id. at 1295. The court noted that one parent, Marjorie Rogers, "was not happy with the Sticker because it did not go far enough in stating that there were criticisms of evolution and it did not distinguish macroevolution from microevolution." Id.

The court applied the Lemon test. In doing so it found "highly credible" the testimony of the board members, id. at 1303, which persuaded the court that the board "did not seek to disclaim evolution by encouraging students to consider it critically," but instead "sought to encourage students to analyze the material on evolution themselves and make their own decision regarding its merit." Id. at 1302. Later, in its analysis, the court stated that the testimony of the board members also made it clear that the board "adopted the Sticker to placate their constituents and to communicate to them that students' personal beliefs would be respected and tolerated in the classroom." Id. at 1303. While recognizing that a variety of concerns may have motivated individual board members, id. at 1292–94, the court reasoned that the sticker did serve at least two secular purposes. Id. at

16

1305. The two purposes the court found were fostering critical thinking and reducing offense:

> First, the Sticker fosters critical thinking by encouraging students to learn about evolution and to make their own assessment regarding its merit. Second, by presenting evolution in a manner that is not unnecessarily hostile, the Sticker reduces offense to students and parents whose beliefs may conflict with the teaching of evolution.

Id. Based on these findings, the court concluded that the sticker satisfied the first prong of the Lemon test. Id.

The court reached a different conclusion about the effects prong. While reiterating its finding that the board members had not adopted the sticker in order to promote or advance religion, id. at 1308, the court nonetheless concluded that "in light of the sequence of events that led to the Sticker's adoption, the Sticker communicates to those who endorse evolution that they are political outsiders, while the Sticker communicates to the Christian fundamentalists and creationists who pushed for a disclaimer that they are political insiders." Id.

The court reasoned that the sticker isolates evolution for special consideration, and "[i]n light of the historical opposition to evolution by Christian fundamentalists and creationists in Cobb County and throughout the Nation, the informed, reasonable observer would infer the School Board's problem with

17

evolution to be that evolution does not acknowledge a creator." Id. at 1309. The court thought that "this Sticker misleads students regarding the significance and value of evolution in the scientific community for the benefit of the religious alternatives." Id. According to the court, "the distinction of evolution as a theory rather than a fact is the distinction that religiously-motivated individuals have specifically asked school boards to make in the most recent anti-evolution movement, and that was exactly what parents in Cobb County did in this case." Id. at 1311. By making that distinction in the sticker, the board created the appearance that it has "sided with these religiously-motivated individuals," id., and in that way "the Sticker sends an impermissible message of endorsement." Id. at 1310. For these reasons, the court concluded "that an informed, reasonable observer would interpret the Sticker to convey a message of endorsement of religion." Id. at 1306.

In its analysis of the sticker's context, the court found that the "message has an overwhelming presence" because it appears in the front of the textbooks, focuses solely on evolution, and is explicitly endorsed by the school board. Id. at 1311. The court noted that the intended audience is impressionable students and observed that stickers do not appear in any other Cobb County textbooks. Id. Based on the sticker's context, the court concluded that regardless of what

18

happens during classroom instruction, "the Sticker has already sent a message that the School Board agrees with the beliefs of Christian fundamentalists and creationists," and in doing so, has impermissibly entangled itself with religion. Id. at 1312.

Finally, the court concluded, without additional factfindings or explanation, that the sticker violated article I, section 2, paragraph 7 of the Georgia Constitution because it "aids the beliefs of Christian fundamentalists and creationists," and the school board had used taxpayer money to produce the stickers and affix them to the textbooks. Id. at 1313.

Accordingly, the court ordered defendants to remove the sticker from every textbook in which it had been placed and permanently enjoined the defendants from disseminating the sticker in any form. Id. The court directed plaintiffs to file their claims for damages, fees, and costs. Id. It later granted their request for nominal damages. Thereafter, the defendants filed a notice of appeal.

### III.

There are serious problems with two major sequence of events findings that underlie the district court's decision that the school board's adoption of the sticker violated the Establishment Clause. The court decided that while the purpose behind the board action passed muster so that there was no Lemon first prong

19

problem, Selman, 390 F. Supp. 2d at 1305, the effects of the action did not, rendering it unconstitutional under the second prong. Id. at 1312. The court collapsed the third prong into the second, apparently believing that any action with a forbidden religious effect also constituted excessive entanglement. Id. at 1299, 1312. In other words, the court's decision that the sticker violated the Establishment Clause turned on its conclusion that the adoption and use of the sticker had the effect of advancing and endorsing religion. That conclusion was heavily influenced by the court's findings about the sequence of events that led to the adoption of the sticker. The court stated: "in light of the sequence of events that led to the Sticker's adoption, the Sticker communicates to those who endorse evolution that they are political outsiders, while the Sticker communicates to the Christian fundamentalists and creationists who pushed for a disclaimer that they are political insiders." Id. at 1308 (emphasis added).

The two key facts that the district court stressed as defining the sequence of events leading to the board's adoption of the sticker were a letter from Marjorie Rogers and a 2,300 name petition the court thought she submitted to the board, both asking that the board place a "disclaimer" about evolution in the textbooks discussing the subject. Id. at 1303. In discussing the events that led to the board's adoption of the sticker, the district court stated:

Opposed to the presentation of evolution as a fact rather than as a theory, Ms. Rogers organized and presented a petition to the School Board that contained the signatures of about 2,300 Cobb County residents. The petition requested that the School Board "clearly identify presumptions and theories and distinguish them from fact." The petition also requested, among other things, that the Board ensure the presentation of all theories regarding the origin of life and place a statement prominently at the beginning of the text that warned students that the material on evolution was not factual but rather was a theory . . . .

In response to the outcry from these parents, certain unidentified members of the School Board consulted legal counsel to determine if there was any language that would help to address parent concerns within the confines of the law . . . .

Id. at 1291–92 (emphasis added). The actual wording of the sticker derived from

the board's request to its counsel and counsel's response to that. Id. at 1292.

Later in its opinion the district court again stressed what it understood to be

the sequence of events that led to the adoption of the sticker:

Evidence in the record suggests that the idea of placing a sticker in the textbooks originated with parents who opposed the presentation of only evolution in science classrooms and sought to have other theories, including creation theories, included in the curriculum. Namely, Marjorie Rogers wrote a letter to the School Board over two weeks before the adoption of the Sticker recommending, among other things, that the School Board place a disclaimer in each book. Moreover, Ms. Rogers and over 2,300 other Cobb County citizens submitted a petition to the School Board also asking the

21

> School Board to place a statement at the beginning of the
> texts that warned that the material on evolution was not
> factual. There is no dispute that a large number of Cobb
> County citizens opposed the teaching of evolution in a
> rigid fashion, and it is clear to the Court that many of
> these citizens were motivated by their religious beliefs.

Id. at 1303 (emphasis added). The court thought that the board's decision to have a sticker placed in the textbooks came about because of the letter Marjorie Rogers wrote to the board and the 2,300 name petition it thought that she had submitted to the board. Having outlined the sequence of events in its factfinding and purpose inquiry, the district court specifically relied on the timing of events in concluding that the sticker had the effect of advancing or endorsing religion. Id. at 1308 (stressing the sequence of events).

There is a serious problem with that reasoning. The findings on which it is based are not adequately supported by the evidence in the record before us. The evidence in the record before us does not establish that the Rogers letter was submitted to the board before it adopted the sticker. And the only petition in the record that resembles the one the court described came well after the board's action.

22

## A.

Everyone agrees that on March 28, 2002 the board voted to place a sticker in the science textbooks and approved the language that sticker would contain. The only letter in the record from Marjorie Rogers to the school board, as the record came to us, has two dates on it. The first page is dated September 26, 2002, while the second and third pages are dated September 24, 2002. Obviously, a letter that came six months after a decision could not have had any effect on that decision. (That letter does not request or suggest the use of a sticker, anyway.)

This is as good a place as any to discuss a complicating factor that shows how truly confused the record on appeal is. At trial, the parties stipulated "that letters, e-mails, and other documents were received by the [Cobb][3] County School District <u>concerning the controversy that led to the evolution sticker</u> and that they were reviewed by some, but not all, school board members" and "that a mutually agreed upon sample of such documents will be presented jointly to the Court by . . . Friday." On that Friday, the last day of the trial, counsel for the defendants signed and filed a handwritten document, marked Docket Entry No. 99, that simply stated: "Attached are documents which include a sampling of those

---

[3] Plaintiffs' attorney mistakenly referred to the "Clayton" County School Board, but this error was later corrected.

23

received by the board as stipulated by the parties." We do not know what documents were attached when it was filed, but by the time we received the record on appeal Docket Entry No. 99 was barren. Nothing at all was attached to it.

With some nudging from us at oral argument, the attorneys attempted to reassemble the documents that were attached to Docket Entry No. 99, but without much luck. On December 28, 2005, they filed with the district court a volume of ninety-four documents labeled "1st Supplemental" record on appeal, which was transmitted to us. The supplemental filing, which is an attempt to recreate the documents that had been attached to Docket Entry No. 99, states: "The parties have met and reviewed some of the documents from which they currently believe Docket Entry No. 99 may have been compiled during trial."

In that, their first supplemental filing, the parties submitted ninety-four documents, but both sides could "say with certainty" that only two of those documents were part of the original record. One of those two documents consisted of the citizen textbook comment forms filled out by some parents, all of which were dated between February 26 and March 6, 2002. Only two of the parents submitting forms commented on evolution. One was Marjorie Rogers, who criticized the textbooks' failure to address alternative theories of origin but did not suggest the use of a sticker. The other parent who commented stated that he:

24

"was <u>very</u> happy w/ the inclusion of evolution even if not by that term . . . we must teach this (I firmly believe in the 'meaning' of the Bible)" (emphasis, parentheses, and alterations in original). The only other document both sides could agree was part of the original record was a petition opposing the sticker that was submitted to the board by the Emory University science faculty on September 9, 2002.

The rest of the documents that the parties presented to us in the first supplemental record are divided into three categories: (1) there are nine documents that the plaintiffs (no mention of the defendants) can "say with certainty" were included in the stipulated filing in the district court; (2) there are two documents that the defendants (no mention of the plaintiffs) can "say with certainty" were included in that stipulated filing; and (3) there are eighty-one documents that "may have been included," but neither side can "say with certainty" that they were included in the stipulated filing in the district court.

Most of those ninety-two documents that the parties could not agree were contained in the original record are letters, emails, and petitions sent to the board expressing one of the following sentiments: (1) contempt for the board's decision to adopt the sticker; (2) support for the board's decision to adopt the sticker; or (3) concern over the new policy and the possibility that creationism would be discussed in the classroom. Eighty-six of the ninety-two documents are dated.

The earliest one of them is dated May 10, 2002, which is over six weeks after the sticker was adopted by the board. In fact, eighty-three of those eighty-six documents are dated on or after August 15, 2002, which is four and a half months following the adoption of the sticker. With the exception of the few citizen textbook comments, which we have already discussed, every document included in the first supplemental record as possibly having been part of the evidence at trial is dated well after the board's adoption of the sticker on March 28, 2002. They could not possibly have led to the board's decision.

Then came the second supplemental record filing. On March 14, 2006, the parties filed with the district court a "Second Joint Notice of Filing of Documents to Replace the Misplaced Attachment to Docket Entry Number 99," which was transmitted to us. In that filing, the parties stated that they had reviewed all of the documents that they believe may have been part of Docket Entry No. 99, in addition to the documents that they had included in their first supplemental filing. The first document in this second supplemental filing is a letter from Marjorie Rogers to the school board. It is dated April 5, 2002, which is after the sticker was adopted. However, the letter indicates that Rogers had earlier asked the board to adopt a "disclaimer" and that she was concerned about the sticker language the

26

board had chosen. The letter requests an alteration of that language, an alteration the board never adopted.

Attached to the April 5, 2002 Rogers letter in the second supplemental filing is a document dated March 13, 2001. That document appears to be another letter from Rogers addressed to the board. Although it is dated 2001, that may be a typographical error, because the first sentence refers to Rogers' review of "the science textbooks recommended for adoption this year," and the science textbook review process occurred in 2002. The document specifically requests, among other things, that the board adopt a "disclaimer" and place it in the science textbooks.

In any event, the parties seem to agree that the letter written by Rogers and sent to the board was not admitted into evidence at trial. In the notice of filing, the defendants stated that they "do not believe" the letter was part of Docket Entry No. 99 but do believe it "may have been" used at trial. However, they did not share with us how it may have been used nor did they cite any part of the trial record to support their speculation. The plaintiffs stated that they "cannot say with certainty" whether the letter was part of Docket Entry No. 99 or whether it was used at trial. In deciding issues on appeal we consider only evidence that was part of the record before the district court. S & Davis Int'l, Inc. v. Republic of Yemen,

218 F.3d 1292, 1299 n.5 (11th Cir. 2000); <u>Shahar v. Bowers</u>, 120 F.3d 211, 213 n.1 (11th Cir. 1997) ("At no time when a case is on appeal is adding information to the record—information that was never before the district court—usual and favored by the law.").

In addition to that Marjorie Rogers letter, the second supplemental record filing includes three hundred and five other documents attached in a large, three-ring binder weighing fourteen pounds. As to all of those documents, the parties stated to us that neither the plaintiffs nor the defendants can say with certainty whether they were made part of Docket Entry No. 99. We did not find that helpful. Without attempting any sort of summary, suffice it to say that these "who knows" documents do not include any additional letters from Marjorie Rogers or any 2,300 name petition from her or anyone else.

**B.**

The alleged petition is another big problem with the district court's findings. In the trial record and in the first and second supplemental filings there is no 2,300 name petition, no petition that includes Marjorie Rogers' signature or name, and no petition of any kind dated before the board adopted the sticker on March 28, 2002. In his deposition testimony, Cobb County School District Superintendent Joseph Redden did testify that he recalled Marjorie Rogers presenting the board

28

with some petition before it voted to adopt a sticker. He was, however, unclear about the specifics, and at trial he testified only that Rogers had presented the board with a petition. He did not say and was not asked when she had done that.

Rogers herself testified and was questioned by plaintiffs' trial counsel about the alleged 2,300 name petition. He did not ask her when she presented it to the board. During his questioning of Rogers, plaintiffs' counsel handed her what he described as "copies of your petition," but he did not offer into evidence a copy of what he showed her, and no one supplied us with one later. Interestingly, during closing argument to the court plaintiffs' counsel read from what he described as "the petition you heard so much about" and quoted the exact language of a September 26, 2002 petition, which would have been six months after the adoption of the sticker. In the original trial record there is a copy of that September 26 petition. It contains only a few hundred names, none of them is Marjorie Rogers, and the wording of the petition makes it clear that the board had already adopted the sticker.

We are convinced from our painstaking review of the record and the parties' various submissions to us that: no copy of any 2,300 name petition was ever put into the record; when plaintiffs' trial counsel questioned Marjorie Rogers about the petition he used some other document; and in describing to the court the

29

petition that it had heard so much about he read from one that was not submitted to the board until at least six months after the sticker was adopted. The record, even as supplemented, does not support a finding that the board was presented with a 2,300 name, anti-evolution, pro-sticker petition—or any other petition—before it adopted the sticker. Our conclusion in this regard is consistent with the findings of fact and conclusions of law that the plaintiffs submitted to the district court, which do not suggest otherwise. As plaintiffs' counsel on appeal has acknowledged: "Perhaps because the 2300-signature Rogers Petition is missing from the record, both parties have confused it with the September Petition." He also made this remark: "The trial transcript is replete with testimony about documents where the absence of identification by exhibit number and other foundational information make it difficult to ascertain with certainty from the appellate record what is being discussed." That is, if anything, an understatement.

We turn now to what we should do about factfindings unsupported by evidence in the record and rampant confusion about what evidence was before the district court.

## IV.

Fed. R. App. P. 10(e)(2) provides a procedure for correcting omissions or misstatements in the record on appeal through a supplemental record certified by

stipulation of the parties, by order of the district court, or by order of the court of appeals. The parties have tried diligently but unsuccessfully to correct the record; there is nothing left that they can do. Nor is there any indication or suggestion that the district court could correct all the problems with this record. We have no reason to believe, for example, that the district court would know any more about what was attached to Docket Entry No. 99 than the parties do. Given that the parties' knowledge and efforts have been exhausted without good result, and we are convinced that they simply do not know what was included in the evidence submitted to the district court, there would not seem to be much point in a Rule 10(e)(1) hearing.

We have said that the burden is on the appellant to ensure the record on appeal is complete, and where a failure to discharge that burden prevents us from reviewing the district court's decision we ordinarily will affirm the judgment. See Loren v. Sasser, 309 F.3d 1296, 1304 (11th Cir. 2002) (failure to provide a transcript in an appeal raising evidentiary error issues); Borden, Inc. v. Fla. E. Coast Ry. Co., 772 F.2d 750, 758 (11th Cir. 1985) (failure to provide any of the evidence the district court had before it when the challenged ruling was made); Green v. Aetna Ins. Co., 397 F.2d 614, 615 n.5, 618–19 (5th Cir. 1968) (failure to provide the record of a lawsuit in another jurisdiction, where that record had been

31

before the district court when it made the challenged factfindings).  The rationale of these decisions, we suppose, is that where it is the appellant's fault that an appellate court cannot properly carry out its review the appellant is the one who should suffer the consequences, and inflicting them encourages proper preparation and presentation of the record on appeal.

The absence-equals-affirmance rule that applies in the usual situation does not apply here because the cumulative effect of six considerations convinces us this is not the usual situation.  First, this is not a case in which the appellants had the evidence, or had access to it, at the time the appeal was taken but chose not to include it in the record on appeal.  This appears to be less a case of unsupplied evidence than one of missing evidence.  Second, we cannot say it was the appellants' fault that the evidence is missing from the record.  In the circumstances that brought us to this point, there is more than enough blame to go around.  Third, the appellants, like the appellees, have diligently attempted in good faith to supply us with the evidence once we brought the problem to their attention.  Diligently, but without success.

Fourth, this is not a case in which without the missing evidence we have no reason to believe there is any error in the district court's findings.  We cannot conduct a meaningful review of whether the district court's factfindings are

32

supported by the evidence before it without knowing what that evidence was. Without the missing evidence we cannot tell the extent of any errors in the findings or the effect they had on the court's decision.

Fifth, both parties challenge decisions of the district court. The defendants challenge the conclusion of the district court that the sticker was an endorsement of religion, and the plaintiffs challenge the finding that the school board acted with a secular purpose. A complete and accurate record is essential to a full consideration of the arguments of both parties.

Finally, the issues presented by this case are ones of substantial public importance and need to be resolved on their merits based on the facts instead of based upon mutual mishaps, mistakes, and misunderstandings about the evidence. We do not mean to imply that anything less than all of these factors would cause us to remand for further evidentiary proceedings. Because all of the factors are present in this case, however, we think that course of action is the appropriate thing to do.

What we are doing here is quite similar to what we did in Barton v. Comm'r, 893 F.2d 306 (11th Cir. 1990). That appeal from the Tax Court was plagued with an inconsistent and incomplete record. Id. at 307. As a result, we were unable to properly address the merits of some issues ourselves, and we

concluded that only when "missing links in the documentary chain have been provided, can the Tax Court make a proper ruling in this case." Id. at 311. Instead of remanding for a Rule 10 hearing, we remanded for the Tax Court to "start with a clean slate," which was necessary, in part, because that court had "based its analysis on a misunderstanding of the facts of the case." Id. The same appears to be true here.

## V.

In remanding for additional evidentiary inquiry and new findings, we leave it to the district court whether to start with an entirely clean slate and a completely new trial or to supplement, clarify, and flesh out the evidence that it has heard in the four days of bench trial already conducted. The procedural details of the proceedings on remand are within the discretion of that court. Whatever the court decides to do, however, it should take care to ensure that any and all evidence on which it bases any findings is part of the record before it. The parties should ensure that the evidence put before the district court is included in the record on appeal. See United States v. Garrison, 133 F.3d 831, 846 n.28 (11th Cir. 1998) ("It is the responsibility of the parties to work with each other and the clerk's office to ensure that the record on appeal is complete for our review of the

34

appellate issues."). All documentary evidence should be clearly marked and identified.

The district court should take the opportunity to revisit and correct any factfindings that remain without adequate evidentiary support following the additional evidentiary proceedings. It would be helpful if the court issued an entirely new set of findings of fact and conclusions of law. See Fed. R. Civ. P. 52(a). As guidance for the district court on remand, we offer the following non-exclusive list of factual issues that it probably will want to address:

(1) With the exception of the parents' comments submitted during the textbook review process, what, if anything, was submitted to the school board (by parents or other members of the community) before the adoption of the sticker?

(2) Was a petition representing any view regarding the teaching of evolution submitted to the board prior to its March 28, 2002 decision to place the sticker in the textbooks? If so, by whom and what did it say?

(3) Did Marjorie Rogers organize and present a petition to the board with the signatures of 2,300 Cobb County residents asking the board to do any or all of the following things: (1) clearly identify presumptions and theories and distinguish them from fact; (2) ensure the presentation of all theories

regarding the origin of life; and (3) place a statement prominently at the beginning of the text warning students that the material on evolution is a theory not a fact?

(4)     Was the sticker a board-initiated idea, as Superintendent Joseph Redden testified, Record Vol. 7 at 245, or did the idea for the sticker originate with some other source?  If so, who was that source?

(5)     Who formulated the wording of the sticker?  Did the board ask its attorney to draft the language of the sticker in response to a petition?  Did the language come from the Board's attorney?  Did the attorney draw that language from any petition or letter?  If so, what?  Did anyone propose that language for a religious purpose?

(6)     What happened at the March 13, 2002 school board meeting?  Was the board specifically asked to place a disclaimer in textbooks that contain materials on evolution?  If that request was made, who made it, and in what form?

(7)     Do the minutes from the school board's March 27–28, 2002 meetings support the conclusion that citizens' concerns prompted the board to consider the idea of putting a statement at the beginning of certain science textbooks?

(8) Did the idea of placing a sticker in the textbooks originate with those parents and citizens who opposed the presentation of evolution in science classrooms without other theories, including creationism theories, being included in the curriculum?

(9) In finding an unconstitutional endorsement, the order issued January 13, 2005 refers to "the sequence of events that led to the Sticker's adoption." Selman, 390 F. Supp. 2d at 1308. What does the sequence of events include and in what order did they occur?

If the court relies on any of Marjorie Rogers' testimony from the first bench trial, answers to the following questions might be helpful:

(10) At trial Marjorie Rogers testified as follows:

> Q. And I understand that you wanted the school board to do certain things as a result of the petition; is that right?
> A. Yes.
> Q. Let me know if you don't happen to recall what they are because we have copies that will help refresh your recollection.
> A. I have not read the language on the petition in a while.
> . . . .
> Q. Let me hand you copies of your petition. If you can just take a moment and read the heading there.
> A. Out loud?
> Q. No, just to yourself.
> . . . .

37

Q. Now that you've had an opportunity to refresh your recollection, do you recall that one of the things your petition said you wanted the school board to do is clearly identify presumptions and theories and distinguish them from fact?

A. Yes.

Q. So to say: This is a theory, not a fact, this is a theory, this is a fact, that sort of thing?

A. Yes.

Q. Okay. Where a textbook violates that rule, you want the student to be notified; is that right?

. . . .

A. Yes.

Q. Yes? All right. You want the Cobb school board to make sure that all theories are presented; is that correct?

. . . .

A. I just want an even footing, you know, if there's any kind of a scientific support for a theory.

Record Vol. 6 at 38–40.

Q. One of the things, according to the petition, that you wanted the Cobb school board to do was to place a statement prominently at the beginning of the text which warns students; is that right?

A. I believe—is that the language I used? I forget. Which one is that? Which number?

Q. If it helps to refresh your recollection, it's item number 3.

A. Yes.

Q. Yes, is that right, you wanted the Cobb school board to place a statement prominently in the beginning of the text which warns the students?

A. That was my third choice. But, yes, I thought that would be the least they could do, is let the students know that the material that they were about to be reading is not factual, but rather theory.

38

Q. All right.
A. My first choice was that they should provide supplemental information which fills in the holes of facts that are missing and exposes the material in the textbook that was not factual. That was my first choice.
. . . .
Q. I understand that you submitted this 2300-signature petition to the board; is that right?
A. Yes.
Q. I understand later on that you wrote a letter to the board on May 23, 2002; is that correct?
A. I know I wrote them a letter.
Q. Pardon?
A. I know I wrote them a letter. I don't know the date.
Q. Perhaps this will help refresh your recollection.
A. Thank you. Okay, this is after the sticker had already been passed.

Record Vol. 6 at 46–49. What documents was Rogers shown and what were their exact dates? What were the contents of those documents?

(11)   Rogers' testimony at trial indicates that (1) she filled out her textbook review forms on February 26, 2002, Record Vol. 3 Doc. 77 Attach. 42; (2) "at a later time" she reviewed the textbooks a second time, Record Vol. 6 at 33; (3) after that, she attended a "working meeting" of the board to make her concerns known, id. at 38, 32–33, 54; (4) after the working meeting she "start[ed] to gather" and "put together a petition," but "that wasn't immediate." Id. at 38.

39

On what date did Rogers review the textbooks for a second time? When did she attend a working meeting of the board to make her concerns known? When did she start to gather signatures on a petition? When, if ever, did she verbally announce to the board her intention to "put together" a petition? When, if ever, did she submit to the board a written petition? How many names did any petition she submitted to the board have on it? If the court intends to rely on evidence and statements from the first trial regarding whether a petition containing 2,300 names was presented to the board, the answer to this question might be helpful:

(12)   A petition dated September 26, 2002 appears in the record on appeal. It states:

> To the Cobb County School Board
> September 26, 2002
>
> We, the concerned citizens and tax payers of Cobb County support the policy you are considering which will allow open discussion about the theory of evolution as well as other legitimate, scientific views concerning the origin of life, such as intelligent design.
>
> We also support the disclaimer placed in the science text books which state [sic] that the theory of evolution is not a fact and that it should be critically considered.

Record Vol. 3 Doc. 77, Attach. 45.

One hundred and twenty-three names appear on that petition. Marjorie Rogers' name is not on it. This document was read into evidence during plaintiffs' closing argument. It was referred to by plaintiffs' attorney as "[t]he petition that you heard so much about." Record Vol. 9 at 552. Is this the document that the parties repeatedly referred to as "Marjorie Rogers' petition?"

In regard to the content of the sticker:

(13) Is the statement in the sticker that evolution is a theory and not a fact generally consistent with the description of evolution contained in the textbook Biology? If not, how do the two differ?

(14) Is the statement in the sticker that evolution is a theory and not a fact generally consistent with the 101 pages of material concerning evolution that is in the textbook Biology? Does that specific statement in the sticker contradict any specific statements in the textbook? If so, which ones?

(15) Dr. Miller testified about what the order describes as "the colloquial or popular understanding of the term [theory]." Does he have any qualifications to testify as an expert on the popular meaning of the word "theory"?

(16) Is the statement in the sticker that the material on evolution in the textbook Biology "should be approached with an open mind, studied carefully, and critically considered" consistent with the approach taught in the textbook itself? If not, how is it inconsistent?

Finally:

(17) Do most teachers in the school district who use the textbook Biology teach some substantial part of the 101 pages of evolution material in it?

(18) To what extent, if any, did teachers in the classes in which any textbook containing the sticker was used discuss or teach theories of origin other than evolution?

These questions are only suggestions, and they are not exclusive. The district court can and should include findings on any other factual issues that it deems relevant to the case. The court is free to frame its factfindings in any clear and specific manner that complies with Fed. R. Civ. P. 52(a). In making its findings the court should, of course, take into account any new evidence that is introduced into the record on remand.

## VI.

In vacating the district court's judgment and remanding the case for additional proceedings, we want to make it clear that we do not intend to make any

implicit rulings on any of the legal issues that arise from the facts once they are found on remand.  We intend no holding on any of the legal premises that may have shaped the district court's conclusions on the three <u>Lemon</u> prongs.  Mindful that in this area factual context is everything, we simply choose not to attempt to decide this case based on a less than a complete record on appeal or fewer than all the facts.

We are aware, as our earlier recounting of the proceedings indicates, that in addition to holding that the adoption of the sticker violated the Establishment Clause of the First Amendment the district court also ruled that it violated article I, section 2, paragraph 7 of the Georgia Constitution.  There is no reason to believe that one-paragraph ruling was not plagued by the same evidentiary uncertainties and factual problems that taint the court's ruling on the federal issues.  We express no view on how the state constitutional issue should be decided, or if it should be, <u>see</u> 28 U.S.C. § 1367(c), once the facts are properly found and the federal constitutional issue is decided.

**VACATED** and **REMANDED** for further factfindings consistent with this opinion.