FLAUM, Circuit Judge,
dissenting in part.
I agree that the plaintiffs have standing and that the district court committed no *735 error by allowing them to proceed anonymously. Similarly, as a general matter, I take no issue with the majority’s reliance on Lemon v. Kurtzman’s frame-work for resolving establishment clause cases. See 403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).[1] Of course, the touchstone for establishment clause challenges remains “the principle that the First Amendment mandates government neutrality between religion and religion, and between religion and nonreligion.” McCreary County Kentucky v. ACLU, 545 U.S. 844, 860, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) (quotation marks omitted). The determination is case-specific: whether a particular practice violates the establishment clause is “in large part a legal question to be answered on the basis of judicial interpretation of social facts” which “must be judged in their unique circumstances.” Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 315, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000).
I believe that conducting a public school graduation ceremony at a church — one that among other things featured staffed information booths laden with religious literature and banners with appeals for children to join “school ministries” — runs afoul of the First Amendment’s establishment clause as applied to the states via the Fourteenth Amendment’s due process clause.[2] In my view, that conclusion is consistent -with well established doctrine prohibiting school administrators from bringing church to the schoolhouse. E.g., People of State of Illinois ex rel. McCollum v. Bd. of Educ. of Sch. Dist. No. 71, Champaign County, Illinois, 333 U.S. 203, 211-12, 68 S.Ct. 461, 92 L.Ed. 649 (1948) (religious instruction in public schools held unconstitutional). The same result should obtain when administrators bring seminal schoolhouse events to a church — at least to one with the proselytizing elements present in this case. The constitutional flaw with such activity is that it necessarily conveys a message of endorsement. Moreover, the Supreme Court’s “coercion cases,” Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) and Santa Fe, cannot be meaningfully distinguished — both because endorsement is intrinsically coercive and because there was coerced activity in this case.
Establishment clause jurisprudence has long guarded against government conduct that has the effect of promoting religious teachings in school settings, and the case law has evinced special concern with the receptivity of school children to endorsed religious messages. In Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam), for instance, the Supreme Court barred enforcement of a Kentucky statute requiring the posting of a copy of the Ten Commandments on the wall of each public school class-room within the state. The Court’s brief discussion concluded that the statute ran afoul of Lemon’s first prong, whether the legislation had a secular purpose. Id. at 41, 101 S.Ct. 192 (concluding that the purpose for posting the commandments was “plainly religious in nature”). In reaching that conclusion, the Court entered into a dis *736 cussion of Lemon’s second prong, whether the primary effect of government conduct advances or inhibits religion. The Court reasoned that “[i]f the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the school children to read, meditate upon, perhaps to venerate and obey, the commandments.” Id. at 42, 101 S.Ct. 192. I perceive essentially the same problem in the circumstances of this case.
Displaying religious iconography and distributing religious literature in a classroom setting raises constitutional objections because the practice may. do more than provide public school students with knowledge of Christian tenets, an obviously permissible aim of a broader curriculum. E.g., Edwards v. Aguillard, 482 U.S. 578, 608, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (Powell, J., concurring). The concern is that religious displays in the classroom tend to promote religious beliefs, and students might feel pressure to adopt them. The concern was front and center in Stone and apparent to one degree or another in the Supreme Court’s school prayer cases. See Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (Alabama law authorizing a moment of silence for meditation or voluntary prayer held unconstitutional); Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (opening exercises featuring Bible recitation and reading of Lord’s prayer held unconstitutional); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (prescribed daily prayer held unconstitutional). The same problem attends pervasive displays of iconography and proselytizing material at a public secondary school graduation.
In this case, high school students and their younger siblings were exposed to graduation ceremonies that put a spiritual capstone on an otherwise secular education. Literally and figuratively towering over the graduation proceedings in the church’s sanctuary space was a 15- to 20-foot tall Latin cross, the pre-eminent symbol of Christianity. That symbol “carries deeply significant meaning for those who adhere to the Christian faith.” Salazar v. Buono, — U.S. -, 130 S.Ct. 1803, 1836 n. 8, 176 L.Ed.2d 634 (2010) (Stevens, J., dissenting). Moreover, it is a symbol that invites veneration by adherents. E.g., 2 St. Thomas Aquinas, Summa Theologica, q. 25, art. 3 at 2157 (Benzinger Bros., 1947). The cross, like many symbols, is “pregnant with expressive content.” See Texas v. Johnson, 491 U.S. 397, 405, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). It acts as a “short cut from mind to mind,” West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 632, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), for adherents who draw strength from it and for those who do not ascribe to Christian beliefs. Although the setting in which a symbol is displayed can shape its message, cf. Buono, 130 S.Ct. at 1811 (plurality opinion) (stating that the purpose and intent of a Latin cross placed on an outcropping in the desert was “to honor American soldiers who fell in World War I”), there is no doubt that a sectarian message is conveyed by a cross prominently displayed in a house of worship. See also McCreary County, 545 U.S. at 868, 125 S.Ct. 2722 (stressing the importance of the context in which a “contested object appears”) (quoting County of Allegheny v. ACLU, Greater Pittsburgh Chapter, 492 U.S. 573, 595, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (opinion of Blackmun, J.)); Van Orden v. Perry, 545 U.S. 677, 701, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (Breyer, J., concurring) (discussing contexts in which Ten Commandments displays might appear).
What is more, Elmbrook Church’s sizeable cross was not the only vehicle for conveying religious messages to graduation attendees. Upon passing through the *737 exterior doors of the church, attendees proceeded into a lobby that contained numerous religious materials. Those materials included pamphlets for “middle school” and “high school” ministries. The middle school ministry pamphlet stated, ICWe are calling students to live and love like Jesus.” As the majority reports, ante at 714 n. 7, a poster on the wall asked, “Hey Jr. Highers! Who Are Your Heroes?” and depicts pop culture icons alongside Jesus Christ. Anticipating the desired answer to the poster’s question, there were several stations indicating that children and students (there were labels) could obtain religious literature tailored to them. Among the banners that have been draped from the lobby’s ceiling during graduation ceremonies is one that read “Children’s Ministry: Leading Children to a Transforming Life in Christ.” Moreover, all 360 degrees of the lobby’s substantial, circular information booth were stocked with religious pamphlets. It was staffed during at least some of the school district’s graduation ceremonies, and the literature was readily accessible even without the staff presence. Returning to the sanctuary itself, which is where the ceremonies took place, the pews were supplied with Bibles, hymnals, and additional informational literature. Children in attendance could find “scribble cards” in the pews on which “God’s Little Lambs” could draw.' Anyone could partake of the cards soliciting membership in the church. During at least one graduation ceremony, church members passed out religious literature directly to audience members. Put simply, the environment was pervasively Christian, obviously aimed at nurturing Christian beliefs and gaining new adherents among those who set foot inside the church.
Regardless of the purpose of school administrators [3] in choosing the location, the sheer religiosity of the space created a likelihood that high school students and their younger siblings would perceive a link between church and state. That is, the activity conveyed a message of endorsement. High school graduations enjoy an iconic place in American life. Lee, 505 U.S. at 583, 112 S.Ct. 2649. Given their centrality, the presence of religious iconography and literature is likely to prove particularly powerful, indicating to everyone that the religious message is favored and to nonadherents that they are outsiders. See Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 9 n. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989) (quoting Wallace, 472 U.S. at 38, 105 S.Ct. 2479 (O’Connor, J., concurring)). Here, the church was not just adorned with its own symbols, it was draped in the high schools’ decorations. Banners for the high schools were displayed in the lobby and in the sanctuary, mixed in with the church’s religious decor and literature. In the sanctuary, the high schools’ names were projected onto a large screen adjacent to the Latin cross. Combined with presence of the Church’s pamphlets for its “school” ministries, the setting would have implied to nonadherents in attendance that the school district placed its imprimatur on Elmbrook Church’s message. See Santa Fe, 530 U.S. at 307-08, 120 S.Ct. 2266 (remarking on the intermixing of an invocation with the accouterments and hallmarks of high school life and concluding that “the listening audience *738 must perceive the pregame message as a public expression of the views of the majority of the student body delivered with the approval of the school administration”).
The Supreme Court’s decisions in Lee and Santa Fe cannot be meaningfully distinguished on the ground that the school district did not coerce overt religious activity. Lee, 505 U.S. at 605, 112 S.Ct. 2649 n.6 (Blackmun, J., concurring) (observing that as a practical matter “any time the government endorses a religious belief there will almost always be some pressure to conform”). First, coercion has never been the sine qua non of an establishment clause violation. Santa Fe, 530 U.S. at 313-14, 120 S.Ct. 2266 (noting that coercion was not the Court’s sole concern and that the establishment clause may be “eroded” in “myriad, subtle ways”); Comm. for Public Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 786, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973). Moreover, although Lee and Santa Fe focus on the problem of coerced religious activity, it is a mistake to view the coercion at'issue in those cases as divorced from the problem of government endorsement of religion in the classroom generally. In fact, they are two sides of the same coin: “When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain.” Wallace, 472 U.S. at 60 n. 51, 105 S.Ct. 2479 (alteration omitted) (quoting Engel, 370 U.S. at 430, 82 S.Ct. 1261). And government efforts at shaping religious views may prove effective over time. Lee, 505 U.S. at 592, 112 S.Ct. 2649; cf. also A Letter to Richard Burke, Esq., on Protestant Ascendency in Ireland, in vol. VI Works of the Right Honorable Edmund Burke 395 (rev. ed. 1866) (“Man and his conscience cannot always be at war.”). The fact that graduation attendees need not do anything but participate in the graduation ceremony and take advantage of religious offerings if they so choose does not rescue the practice.
What is more, there is an aspect of coercion here. It is axiomatic that “[n]either a state nor the Federal Government ... can force nor influence a person to go to or to remain away from church against his will.... ” Everson v. Bd. of Educ. of Ewing Twp., 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711 (1947). The first principle is violated when the government directs students to attend a pervasively Christian, proselytizing environment. Cf. County of Allegheny, 492 U.S. at 664, 109 S.Ct. 3086 (Kennedy, J., concurring in part and dissenting in part) (observing in the context of creche displays that “[p]assersby who disagree with [their] message[s] ... are free to ignore them, or even to turn their backs, just as they are free to do when they disagree with any other form of government speech”); Wallace, 472 U.S. at 72, 105 S.Ct. 2479 (O’Connor, J., concurring) (noting that under an appropriately crafted moment of silence law a student “who objects to prayer ... is not compelled to listen to the prayers or thoughts of others”). Once the school district creates a captive audience, the coercion inherent in endorsement can operate. When a student who holds minority (or no) religious beliefs observes classmates at a graduation event taking advantage of Elmbrook Church’s offerings or meditating on its symbols (or posing for pictures in front of them) or speaking with its staff members, “[t]he law of imitation operates,” Wallace, 472 U.S. at 60 n. 51, 105 S.Ct. 2479, and may create subtle pressure to honor the day in a similar manner. See also id. at 81, 105 S.Ct. 2479 (O’Connor, J., concurring) (where children are concerned, government endorsement “is much more likely to result in coerced religious beliefs”). The only way for graduation attendees to avoid the dynamic is to leave the ceremo *739 ny. That is a choice, Lee v. Weisman teaches, the establishment clause does not force students to make. See also McCreary County, 545 U.S. at 881-82, 125 S.Ct. 2722 (O’Connor, J., concurring) (“Free people are entitled to free and diverse thoughts, which government ought neither to constrain nor to direct.”).
The effect of endorsement created by the school district’s practice is not diminished by the explanation that the space was rented and school officials could exercise less control over the church than they could over a schoolhouse. The argument provides only superficial appeal. The point appears most cogent with respect to the church’s cross, although the church possessed means of covering the symbol. The point appears less cogent with respect to other aspects of the church which might have been easily modified to render the space more inviting to others. This mode of distinguishing, however, would have us look at the issue of control in an exceedingly narrow manner. The critical facts should be that school administrators effectively required attendance, because graduations are not truly optional, see Lee, 505 U.S. at 595, 112 S.Ct. 2649, and selected the venue. See Abington Twp., 374 U.S. at 222, 83 S.Ct. 1560 (the neutrality required by the establishment clause aims at preventing church and state from acting in concert such that government support is “placed behind the tenets of one or of all orthodoxies”); cf. also Lamb’s Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 395, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (no establishment clause concern for church group to use school space for an event where the district created a public forum and the event would have taken place outside of school hours and without school sponsorship). Nor is the effect diminished by the administrators’ mechanism for choosing the graduation site. The record indicates that, following the results of student elections, the principals of the high schools made the ultimate decisions on where to hold graduation. A “student election does nothing to protect minority views but rather places the students who hold such views at the mercy of the majority.” Santa Fe, 530 U.S. at 304, 120 S.Ct. 2266; see also McCreary County, 545 U.S. at 884, 125 S.Ct. 2722 (O’Connor, J., concurring) (“[W]e do not count heads before enforcing the First Amendment.”).
None of this is to suggest that school officials should have exercised a higher degree of control over the church’s environment, scrubbing it of religious symbols or working to tailor its message to a secular audience. Such a course would have run afoul of Lemon’s excessive entanglement prong. See Bowen v. Kendrick, 487 U.S. 589, 615-18, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988). Instead, school administrators should have examined the space that students voted for and recognized that it was not an appropriate location for holding a public high school graduation ceremony.
In sum, if constitutional doctrine teaches that a school cannot create a pervasively religious environment in the classroom, Wallace, 472 U.S. 38, 105 S.Ct. 2479; Stone, 449 U.S. 39, 101 S.Ct. 192; Abington Twp., 374 U.S. 203, 83 S.Ct. 1560; Engel, 370 U.S. 421, 82 S.Ct. 1261, or at events it hosts, Santa Fe, 530 U.S. 290, 120 S.Ct. 2266; Lee, 505 U.S. 577, 112 S.Ct. 2649, it appears overly formalistic to allow a school to engage in identical practices when it acts as a short-term lessee. Lee, 505 U.S. at 595, 112 S.Ct. 2649 (“Law reaches past formalism.”). The same risk that children in particular will perceive the state as endorsing a set of religious beliefs is present both when exposure to a pervasively religious environment occurs in the classroom and when government summons *740 students to an offsite location for important ceremonial events.
Determining that the school district operated outside permissible constitutional bounds should not be equated with expressing hostility toward Elmbrook Church or its beliefs. The First Amendment, via its free exercise clause, guarantees that government will not impinge on the freedom of individuals to celebrate their faiths, in the day-to-day, or in life’s grand moments. Without question, that is a desirable goal. Whether the event is a meal, a graduation, or a funeral, a signpost or a diversion, sincerely held religious beliefs can remind one to give thanks, spur reflection, or provide emotional rescue in dark days. Religion can lead one to perform works that benefit the community or meditate on what it means to live the good life. Secular belief systems, of course, can serve those ends, too, e.g., Aristotle, Nichomachean Ethics (J.E.C. Welldon trans., 1923); Seneca, On the Shortness of Life, in I Ajd Lucilium Epistulae Morales 322 (Richard M. Gummere trans., 1918), and the establishment clause reinforces the promise of the free exercise clause by prohibiting the government from influencing how a person relates to the universe. “A state-created orthodoxy puts at grave risk that freedom of belief and conscience which are the sole assurance that religious faith is real, not imposed.” Lee, 505 U.S. at 592, 112 S.Ct. 2649; see also McCreary County, 545 U.S. at 883, 125 S.Ct. 2722 (O’Connor, J., concurring).
I conclude that the practice of holding high school graduation ceremonies at Elm-brook Church conveys an impermissible message of endorsement. Such endorsement is inherently coercive, and the practice has had the unfortunate side effect of fostering the very divisiveness that the establishment clause was designed to avoid. Therefore, I respectfully dissent.

. One of our panel members has observed that the Lemon framework is like an opera star that “go[es] on singing after being shot, stabbed, or poisoned.” United States v. Booker, 375 F.3d 508, 516 (2004) (Easterbrook, J.).

. Although I focus my discussion on the school district's practice of holding graduation ceremonies at Elmbrook Church, I believe that the same constitutional defects inhere in the district's use of the church for awards ceremonies. See Santa Fe, 530 U.S. at 311, 120 S.Ct. 2266 (reasoning that conducting invocations at high school football games did not escape the teachings of Lee v. Weisman because extracurricular activities are "part of a complete educational experience”).

. Lemon’s purpose inquiry has rarely proved dispositive, McCreary County, 545 U.S. at 859, 125 S.Ct. 2722, and the favorable features of the church, such as its space and comfort, do not drive the ultimate inquiry into the constitutionality of its use as a high school graduation venue. See Lemon, 403 U.S. at 625, 91 S.Ct. 2105 (noting that though taxpayers have been spared considerable expense through the teaching efforts of churches, the "benefits of these schools ... are not the issue.... The sole question is whether state aid to these schools can be squared with the dictates of the Religion Clauses”).